Howard DEN HARTOG, Plaintiff,

v.

WASATCH ACADEMY, and Joseph Loftin, Defendants.

Civ. No. 94–C–1097W.

United States District Court, D. Utah, Central Division.

Dec. 4, 1995.

**1396**

Stephen W. Cook, Salt Lake City, UT, for plaintiff.

Elizabeth T. Dunning, Carolyn Cox, Brett Del Porto, Watkiss, Dunning & Watkiss, Salt Lake City, UT, for defendants.

MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND MOTION IN LIMINE, AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING IN PART.

WINDER, Chief Judge.

This matter is before the court on three related motions: (1) Plaintiff Howard Den Hartog's ("Den Hartog") motion for partial summary judgment; (2) Den Hartog's motion in limine to exclude certain evidence at trial; and (3) Defendants Wasatch Academy's ("Wasatch") and Joseph Loftin's ("Loftin") motion for summary judgment. The court heard oral argument on all of these matters on November 21, 1995. At the hearing Den Hartog was personally present and represented by Stephen W. Cook, while Defendants were represented by Elizabeth T. Dunning, Carolyn Cox, and Brett Del Porto.

Prior to the hearing, the court considered carefully the memoranda and other materials submitted by the parties. The court had also reviewed a number of the authorities cited by the parties. Now having further considered the law and facts related to this motion, and being fully advised, the court enters the following memorandum decision and order.

## I. BACKGROUND

The undisputed facts,[1] as set forth by the parties, reveal the following:

Defendant Wasatch is a private boarding school for students in 9th through 12th grades, located in Mt. Pleasant, Utah. Mt. Pleasant is a small town, consisting of less than 2½ square miles and approximately 2,000 residents. Defendant Loftin has served as headmaster for Wasatch from 1988 to the present and during the times at issue, Loftin lived on campus with his wife and three children.

Plaintiff Den Hartog was employed by Wasatch Academy from 1968, with a few interruptions, until June 1994 when he was terminated. Den Hartog worked in the Buildings and Grounds Department, and most recently as a faculty member. Den Hartog was employed by Wasatch pursuant to a series of one-year contracts. Den Hartog's 1993–94 contract provided that Wasatch had "the right to terminate this contract immediately for cause, including but not limited to incompetence, cruelty, negligence, immorality and violation of any other covenants of the agreement." The contract further provides that:

Said EMPLOYEE, in addition, agrees to submit to his proportional part of the internal discipline of the ACADEMY, including compliance with directions given him by the Headmaster or his designated rep-

1. Den Hartog has challenged the admissibility of many of these facts. To the extent that the inadmissibility is based on his motion in limine, the court addresses that motion in subsection C of this opinion. As for facts which Den Hartog has claimed are irrelevant, their relevancy is addressed in the court's discussion of the legal issues. As for medical and other records which Den Hartog claims are hearsay, the court has determined that such are admissible under Fed. R.Evid.P. 803(4) (medical diagnosis), 803(6) (records of regularly conducted activity), and/or 803(7) (public records and reports). Also, much of the evidence which Den Hartog objects to as hearsay is not hearsay because it is offered to show its affect on or state of mind of Defendants and not for the truth of the matter asserted. *See* Fed.R.Evid.P. 801(c).

resentatives, and to comply with all by-laws and policies of its Board of Trustees. Said EMPLOYEE further agrees to comply with all reasonable requests of superiors and to comply with policies and rules adopted by ACADEMY during term of employment and to carry out the spirit and intent of such policies and regulations....

Wasatch's Faculty Handbook states that "[t]ermination or a decision not to offer a contract for the next school year must be based either on a change in the employment requirements of Wasatch Academy, substandard performance or cause as specified in individual contracts." The Handbook further provides that in "[e]ach case of termination or refusal of contracts for substandard performance or specific cause as outlined in individual contracts, must be substantiated in writing specifying the reasons for the action taken, previous response by the employee in question." Then, the "employee who has been terminated or refused a contract for substandard performance or cause, may appeal, with the full knowledge of the Headmaster, to the President of the Board of Trustees."

Because Wasatch has a policy—with a few exceptions—of requiring full-time faculty to live on campus, Den Hartog lived on the Wasatch campus with his wife and four children during the times that he was employed by the school. Den Hartog's youngest child is Nathaniel Den Hartog ("Nathaniel") who was born in December 1971. Nathaniel lived with his parents until he graduated from Wasatch in June of 1990, at which time Nathaniel went away to college from fall 1990 until spring 1991. However, Nathaniel did not return to college the next year and instead lived on the Wasatch campus with his parents.

During the time that Nathaniel was living with his parents from the summer of 1991 until the summer of 1992, he engaged in a number of unusual acts: (1) he told people that he was going to Hawaii to see Santa Claus; (2) he chased a fire truck down the street, calling out "Santa, Santa"; and (3) he borrowed $1,000 to use as a down payment for a $100,000 piece of land and told people that God instructed him to build a school on the land. Loftin was aware of these actions by Nathaniel. At this time, Wasatch took no adverse employment action against Den Hartog.

In July 1992 Den Hartog took Nathaniel to a psychologist who diagnosed Nathaniel as having bipolar disorder and recommended that he be hospitalized and treated. Nathaniel was admitted to a hospital on July 20, 1992, and during his ten-day stay was confirmed as having bipolar disorder. He was treated with lithium and discharged on July 30, 1992, to his parents' home on the Wasatch campus. Loftin and other Wasatch employees were aware of Nathaniel's diagnosis and continuing treatment. Rather than taking adverse action against either Nathaniel or Den Hartog, Loftin hired Nathaniel to do part-time work on campus including yard work, painting, and assisting in the day care center.

Then, on March 12, 1993, Nathaniel took the Loftins' 16–year old son to Provo and attempted to admit him to a psychiatric hospital without the Loftins' knowledge. When a hospital employee called Joseph Loftin, he went to Provo to pick up his son. Loftin, of course, was personally aware of this event. Two days later, Nathaniel called the Loftin home several times, asking for the Loftins' son. Nathaniel told Loftin that he would slit his own wrists if Loftin did not put his son on the phone. Loftin, in response, called the police and called Nathaniel's counselor. Four days later, the Loftins found a number of messages from Nathaniel on their answering machine. One of these messages made references concerning the Loftins' four-year old daughter. Loftin called the police who listened to the messages and told Loftin to take the threats seriously. The police also called Nathaniel's doctor. The doctor talked to Loftin about the messages, told Loftin to be concerned, and characterized the messages as "agitated, rude and threatening."

After this incident and at the request of Nathaniel's doctor, Loftin signed an application for Nathaniel's involuntary commitment to an institution. State judge, Cullen Christensen, determined that Nathaniel posed "an immediate danger of physical injury" to himself and others, and ordered his commitment

to the custody of the Utah State Department of Public Health, Division of Mental Health for six months. Loftin was aware of the commitment hearing and that the judge had determined Nathaniel dangerous. After Nathaniel was hospitalized, Wasatch paid for an apartment in Salt Lake City for Nathaniel and his mother to live in when Nathaniel was released so he could receive outpatient treatment. Wasatch contends that it "offered" this solution and that the Den Hartogs "accepted." Den Hartog maintains that this solution was "ordered" or "requested" by Wasatch.[2]

Following Nathaniel's hospitalization, on April 1, 1993, Den Hartog and his wife Esther attended a meeting with Loftin and others to discuss the situation with Nathaniel. The Den Hartogs recorded the meeting. At the meeting Loftin repeatedly told the Den Hartogs that he did not want Nathaniel on campus because of his threatening behavior. Esther Den Hartog responded, in the presence of her husband, that "if we lived here [on campus] and we were having a Christmas celebration with our family we would not say, Nathaniel, you cannot come home because Joe Loftin says you cannot be here." Den Hartog did not object to this statement.

Prior to Nathaniel's release from the hospital, Wasatch contends that the Den Hartogs agreed to not allow Nathaniel to come to Mt. Pleasant or on campus. The Den Hartogs maintain that Wasatch merely made such a request, and do not admit that they agreed.[3] Nathaniel was released from the hospital on April 19, 1993. Within a week of his release, Nathaniel visited Mt. Pleasant and came on campus. Jim Loughlin and other members of the Wasatch Board of Trustees received calls from staff and faculty who were concerned about Nathaniel's presence. Loftin became concerned that the Den Hartogs would not cooperate in keeping Nathaniel off campus, and that as long as Den Hartog worked and lived on campus Nathaniel would continue visiting. As a result, in May 1993, Wasatch decided to assign Den

Hartog to write the school history from Wasatch's development office in Salt Lake City for the 1993–94 school year. Den Hartog received his full salary and a living allowance to pay for a home, utilities, and food.

Before the Den Hartogs moved to Salt Lake City, on about June 1, 1993, Den Hartog's wife Esther brought Nathaniel to Wasatch to help pack for the move. Esther and Nathaniel went to the campus dining room for lunch. Loftin saw them and told Esther that Nathaniel would have to leave. Loftin left to call Jim Loughlin, but Esther and Nathaniel did not leave. Then Richard Esler, Assistant Headmaster for Academic Affairs, saw them and told Nathaniel he would have to leave.

In August of 1993, Nathaniel attended college twenty miles from Mt. Pleasant and Den Hartog provided Nathaniel with a car and placed no restrictions on where Nathaniel could go in the car. On one occasion Nathaniel used the car to drive to the Wasatch campus to attend a basketball game. Then in December 1993, on Christmas Eve and on another occasion the following week, Nathaniel went to the Loftin home to attempt to see the Loftins' son.

On January 24, 1994, Nathaniel battered Byron Bond ("Bond") in Mt. Pleasant. Bond sustained several broken ribs and was treated in the hospital. After Bond was released from the hospital, he met with Loftin to inform him of the battery and warn him that during the attack Nathaniel had stated that he planned to "get" Loftin next. Nathaniel was arrested for aggravated assault, booked into Sanpete County Jail, and then sent to the Utah State Hospital. Nathaniel eventually pled guilty to assault and was discharged from the hospital. Loftin was aware of these events due to his several conversations with the prosecutor on the case.

In February 1994, Loftin determined to not renew Den Hartog's contract for the next year. Shortly thereafter, Loftin met with Den Hartog and told him that his contract would not be renewed because the school

---

**2.** The court must accept the facts as presented by the nonmoving party in its analysis of each motion. For example, in considering the Defendants' motion for summary judgment the court

must accept the disputed fact as presented by the Plaintiff.

**3.** *See* footnote 2.

historian position, which Den Hartog then held, was being eliminated. Although Loftin told Den Hartog that the reason for non-renewal was the elimination of his position, Loftin testified in his deposition that absent Nathaniel's behavior Den Hartog "[v]ery possibly" would still be employed by Wasatch.

Den Hartog filled out an intake form with the Utah Anti–Discrimination Division on April 4, 1994. Then, on April 11, 1994, Den Hartog filed a complaint of discrimination with both the Utah Anti–Discrimination Division and Equal Employment Opportunity Commission. Finally, Den Hartog filed this action on November 10, 1994. In his complaint, Den Hartog alleged that Defendants violated the Americans with Disabilities Act ("ADA") and breached their employment contract. In their answer, Defendants raised a number of defenses including that (1) Defendants properly terminated Den Hartog's employment because he was a direct threat under ADA Section 12113(b); (2) Defendants properly terminated Den Hartog's employment because Nathaniel was a direct threat under ADA Section 12113(b); and (3) Defendants had cause to terminate Den Hartog's employment because both Den Hartog and Nathaniel were a direct threat.

Plaintiff filed a motion for partial summary judgment to strike Defendants' affirmative defenses outlined above and a motion in limine to exclude Nathaniel's medical records and evidence of behavior, mental commitment hearing, police records and reports, and expert testimony of Dr. Lincoln Clark regarding Nathaniel's behavior and mental state. Defendants filed a motion for summary judgment to dismiss both the ADA and contract claims. These three motions present a number of overlapping issues which the court will consider in turn.

## II. *STANDARD OF REVIEW*

■ Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and

that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Wright v. Southwestern Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir.1991).

■ Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Gonzales v. Millers Casualty Ins. Co.*, 923 F.2d 1417, 1419 (10th Cir.1991).[4] The nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

■ In considering whether there exist genuine issues of material fact, the court does not weigh the evidence but instead inquires whether a reasonable jury, faced with the evidence presented, could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir.), *cert. denied*, 502 U.S. 827, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991).[5] Finally, all material facts asserted by the moving party shall be deemed admitted unless specifically controverted by the opposing party. D.Utah R. 202(b)(4).

## III. *DISCUSSION*

### A. *Den Hartog's ADA Claim.*

#### (1) THE LEGAL STANDARD

Den Hartog's ADA claim is unique in that it is based on the rather new and undevel-

---

4. The summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553.

5. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

oped "association discrimination" provision of the ADA. The ADA generally provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual" in terms of employment status. 42 U.S.C. § 12112(a). However, the ADA goes on to define "discriminate" to include "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4) (the "association provision").

Den Hartog contends that Defendants violated the association provision of the ADA by forcing him and his family from the residential housing on campus, transferring him to the school historian position in Salt Lake City, holding him out to ridicule as a result of the adverse employment decisions, and threatening to terminate and terminating his employment. Den Hartog contends that such actions implicate the ADA association provision because the Defendants took such actions because of Den Hartog's father-son relationship with Nathaniel who has a disability, bipolar disorder.

Defendants, on the other hand, argue that the ADA is inapplicable because the undisputed facts show that Defendants took adverse action against Den Hartog only in response to Nathaniel's misconduct, not his disability. Defendants maintain that the ADA distinguishes between disability and misconduct, and allows compensation only for disability-related employment decisions. Plaintiff asserts that even if Defendants merely reacted to Nathaniel's misconduct, such misconduct was caused by his disability and falls within the purview of the ADA association provision.

Whether the ADA applies to both disability discrimination and disability-caused misconduct discrimination is a question of law which the court must resolve. In determining this issue, the court looks to both interpretations of the specific association provision, as well as more general treatments of the disability/misconduct distinction under the ADA.

■ As for the ADA association provision, the EEOC administrative regulations provide some insight as to the intent of Congress in enacting this provision. The regulations provide several examples to "illustrate the scope" of the association provision. 29 C.F.R. Ch. XIV (July 1, 1995) Pt. 1630, App. at 412. The regulations contend that the association provision prohibits an employer from refusing to hire an applicant because the employer *assumes* that the employee will miss work to care for a disabled spouse. *Id.* (emphasis added). Likewise, the provision prohibits an employer from firing an employee who does volunteer work with AIDS patients because the employer *assumes* the employee will contract the disease. *Id.* (emphasis added).

■ As the interpretive guidelines suggest, the ADA association provision is targeted at prohibiting unfounded stereotypes and assumptions against employees who associate with disabled people. At least one court has noted that the association provision does not prohibit discharge of an employee which is not based on an unfounded assumption, but rather on actual conduct. In *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209 (4th Cir. 1994), the employee argued that her employer discharged her because the employer assumed the employee would have to miss additional work in order to take care of her disabled son. However, the Fourth Circuit rejected her argument and affirmed summary judgment in favor of the employer, stating that:

We find no merit in this argument. [The employer] did not make any unfounded assumption that [the employee] would have to miss work to take care of [her son]. Rather, [the employer] responded to [the employee's] record of extended absences in connection with [her son's] care and her actual statement that she would, in fact, have to miss additional work in order to be with her son.... Because [the employee's] termination was not based on any assumption regarding future absences related to [her son's] care, but instead resulted from her record of past absences and her clear indication that she needed additional time off, we hold that [the employer's] actions did not constitute discrimination based on [the employee's] association with a disabled individual.

*Id.* at 214. This interpretation supports Defendants' argument that the ADA association provision would prohibit any employment action based on unfounded assumptions about Nathaniel's bipolar disorder, but would not prohibit action based on Nathaniel's actual misconduct. *See also, Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir.1995) (granting summary judgment to employer on association provision claim where employee could show no causal link between discharge and her son's HIV-positive "status"); *Braverman v. Penobscot Shoe Co.,* 859 F.Supp. 596, 604 (D.Me.1994) (granting summary judgment to employer on association provision claim where employee's allegations did not fall within category of examples provided in regulations).

■ In addition, the plain language of the association provision requires a connection between the employment action and the disability itself. The association provision prohibits adverse employment actions *"because of* the known *disability* of an individual with whom the qualified individual is known to have a relationship...." 42 U.S.C. § 12112(b)(4). This language is virtually identical to the more general ADA provision forbidding employment discrimination against a "qualified individual with a disability *because of the disability* of such individual...." 42 U.S.C. § 12112(a). The majority of Circuit Courts of Appeal interpreting this language have concluded that the "because of the disability" language requires some discrimination based on the disability itself and not on misconduct which may be caused by the disability. *See Maddox v. University of Tennessee,* 62 F.3d 843, 848 (6th Cir.1995); *Despears v. Milwaukee County,* 63 F.3d 635, 637 (7th Cir.1995) (Chief Judge Posner); *Collings v. Longview Fibre Co.,* 63 F.3d 828, 832 (9th Cir.1995). Only the Second Circuit—in the context of the Rehabilitation Act, not the ADA—has determined that misconduct caused by a disability is protected. *See Teahan v. Metro–North Commuter R.R. Co.,* 951 F.2d 511, 515 (2nd Cir.1991), *cert. denied,* 506 U.S. 815, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992).[6]

■ "This court agrees with the majority of Circuit Courts that Congress, in enacting the ADA, intended to prohibit unfair stereotypes about the disabled but not to shield the disabled from the consequences of misconduct.[7] For example, in *Maddox,* the employer or potential employer made improper assumptions about a person's disability.

---

6. Den Hartog argues, in his memorandum in opposition to Defendants' motion for summary judgment, that the Tenth Circuit rejected the disability/misconduct distinction in *Pushkin v. Regents of University of Colorado,* 658 F.2d 1372 (10th Cir.1981). The court finds no merit in this argument. *Pushkin* did not involve any actual misconduct, but rather involved a hiring committee's refusal to hire a candidate with multiple sclerosis because the committee *assumed* that the candidate's disability would lead to misconduct and poor performance. *Id.* at 1391. In upholding the trial court's finding of discrimination after a bench trial, the Tenth Circuit stated:

> We also hold that [the trial judge] applied the proper tests in determining whether defendants' articulated reasons for finding Dr. Pushkin unqualified on the basis of his handicap were legitimate or whether those reasons were based upon incorrect *assumptions* or *inadequate* factual grounds. Based upon the weighing of all the evidence the trial court held that the latter applied....

*Id.* (emphasis added). The court did not discuss the disability/misconduct distinction since there was no misconduct at issue in the case. Rather, *Pushkin* represents the type of case in which the ADA is appropriately applied—a case in which there are issues of fact regarding whether the

7. The EEOC has also taken the position that the ADA does not protect disability-caused misconduct. In a letter dated January 4, 1995, the EEOC responded to a federal district court case which held that disability-caused misconduct is protected by stating:

> It appears that the court's analysis in this case is flawed under the ADA. Specifically, the EEOC has consistently maintained that an employer may hold all employees (i.e., those with and without disabilities) to the same conduct standards. [Citation omitted]. This would certainly include rules prohibiting violence or the threat of violence in the workplace. Although an employer may be required to provide reasonable accommodation (when requested in advance) so that an individual can meet conduct standards, an employer would not be required to rescind discipline for misconduct. Therefore, it appears that this employer could terminate the employee for bringing a loaded gun onto company property, assuming it would impose such discipline on employees without disabilities.

Letter from Claire Gonzales, Director of Communications and Legislative Affairs, EEOC, to Hon-

Sixth Circuit upheld summary judgment in favor of the employer where the facts showed that the employer discharged its football coach because he was arrested for drunk driving. *Maddox*, 62 F.3d at 849. The court rejected the football coach's contention that he was protected by the ADA because his misconduct was caused by his disability of alcoholism. *Id.* at 847. The court stated:

> At bottom, we conclude that the analysis of the district court is more in keeping with the purposes and limitations of the respective Acts, and therefore, we decline to adopt the Second Circuit's reasoning in *Teahan.* Employers subject to the Rehabilitation Act and ADA must be permitted to take appropriate action with respect to an employee on account of egregious or criminal conduct, regardless of whether the employee is disabled.

*Id.* at 848. Similarly, Chief Judge Posner stated on behalf of the Seventh Circuit:

> The refusal to excuse, or even alleviate the punishment of, the disabled person who commits a crime under the influence as it were of his disability yet not compelled by it and so not excused by it in the eyes of the criminal law is not "discrimination" against the disabled; it is a refusal to discriminate in their favor. It is true that the Americans with Disabilities Act and the Rehabilitation Act require the employer to make reasonable accommodation of an employee's disability, but we do not think it is a reasonably required accommodation to overlook infractions of the law.

*Despears*, 63 F.3d at 637. Accordingly, an employee may not "bootstrap his disease into the line of causation" by showing that the misconduct relied on by the employer was caused by the disability. *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995) (affirming dismissal of ADA claim where police officer was fired for failing to control his diabetes).

■ Having concluded that the ADA generally protects disability and not disability-caused misconduct, the court finds the same logic equally applicable to the ADA association provision. The court finds that the ADA association provision does not protect disability-caused misconduct because (1) the associ-ation provision uses the same "because of the . . . disability" language as the more general ADA provision; (2) the court agrees with the majority of Circuit Courts that this language limits its protection to actions based on disability and not misconduct; and (3) the EEOC administrative regulations indicate Congressional intent to limit the scope of the association provision to stereotypes about disability, and to not include misconduct. Accordingly, the court must determine whether there is a genuine issue of fact regarding whether the Defendants took adverse employment actions against Den Hartog due to his son's disability itself.

## (2) THE UNDISPUTED FACTS

Defendants argue that the undisputed facts show that Defendants did not take adverse employment action against Den Hartog because of Nathaniel's bipolar disorder, but rather only took adverse action *after* Nathaniel engaged in threatening and criminal conduct, and refused to stay off campus. The Defendants point out the following chronology of events:

1. Nathaniel engaged in a number of unusual, but non-threatening acts, from the summer of 1991 until the summer of 1992. Although the Defendants were aware of these acts which took place over one year, the Defendants took no adverse employment action against Den Hartog.

2. In July of 1992, Nathaniel was diagnosed as having bipolar disorder and hospitalized for treatment. Although Loftin and other Wasatch employees were aware of Nathaniel's diagnosis and continuing treatment, the Defendants took no adverse action against Den Hartog. Rather, Loftin hired Nathaniel to do part-time work on campus including yard work, painting, and assisting in the day care center.

3. However, beginning in March of 1993 Nathaniel began to engage in a series of threatening acts of which Loftin was aware—taking the Loftins' son to a psychiatric hospital, threatening to slit his wrists, and leaving a series of threatening phone calls on the Loftin answering machine. Nathaniel was involuntarily committed be-

orable John B. Breaux, United States Senate

(Jan. 4, 1995).

cause of these events. The Defendants reacted by providing Nathaniel and his mother with an apartment in Salt Lake City which would facilitate Nathaniel's outpatient care and keep him off campus. Even though Loftin repeatedly told the Den Hartogs that he did not want Nathaniel on campus because of his threatening behavior, Esther Den Hartog responded, in the presence of her husband, that "if we lived here [on campus] and we were having a Christmas celebration with our family we would not say, Nathaniel, you cannot come home because Joe Loftin says you cannot be here." Den Hartog did not object to this statement.

4. Accepting the Den Hartogs' version of facts (as required in analyzing Defendants' motion for summary judgment), the Defendants "requested" that Nathaniel not return to Mt. Pleasant or on campus. Nonetheless, within a week of his release from the hospital Nathaniel violated this request and came on campus. As a result and within a month, the Defendants decided to assign Den Hartog to a position in Salt Lake City. Before they moved, however, Nathaniel again came on campus with his mother in violation of Wasatch's order.

5. In August of 1993, Den Hartog provided Nathaniel with a car and placed no restrictions on its use. Nathaniel used the car to drive to the Wasatch campus and attend a basketball game, in violation of Wasatch's order. Then in December of 1993, Nathaniel went to the Loftin home twice.

6. The Defendants were also aware than in January 1994, Nathaniel attacked a Mt. Pleasant resident, breaking several of his ribs, and threatened to attack Loftin. He was charged and pled guilty to assault.

7. One month after Nathaniel's battery of a Mt. Pleasant resident, Loftin determined to not renew Den Hartog's contract.

 These undisputed facts demonstrate that initially Defendants were aware of a number of Nathaniel's unusual acts indicative of mental illness, and yet took no adverse action against Den Hartog. In fact, once Nathaniel was diagnosed with bipolar disorder the Defendants still took no adverse action. Rather, the Defendants gave Nathaniel a job on campus. From July of 1992

(when Nathaniel was diagnosed) until May of 1993 (when Defendants determined to transfer Den Hartog to Salt Lake City), the Defendants took no adverse action against Den Hartog even though they knew of Nathaniel's disability for about ten months. The first adverse employment decision, transferring Den Hartog, was not made until *after* Nathaniel's threatening behavior. In addition, the decision to transfer Den Hartog was made within a month of Nathaniel violating Wasatch's order that he stay off campus. Based only on this undisputed chronology of events, no reasonable jury could conclude that the Defendants transferred Den Hartog based on Nathaniel's disability, rather than his misconduct and unwillingness to stay off campus.

Defendants also became aware of a number of other facts prior to their decision to not renew Den Hartog's contract—(1) Esther Den Hartog made a comment suggesting that she would not respect Wasatch's order that Nathaniel not come on campus; (2) Esther Den Hartog brought Nathaniel on campus in violation of Wasatch's order; (3) Den Hartog provided Nathaniel with unrestricted use of a car which Nathaniel used to come on campus; (4) on two occasions Nathaniel went to the Loftin home; (5) Nathaniel seriously battered and broke the ribs of a Mt. Pleasant resident and threatened Loftin; and (6) Nathaniel pled guilty to assault. Within one month of Nathaniel's battery of a Mt. Pleasant resident and threat toward Loftin, Loftin made the decision to not renew Den Hartog's contract. Again, based only on this undisputed chronology of events no reasonable jury could conclude that the Defendants terminated Den Hartog based on Nathaniel's disability rather than Nathaniel's misconduct, Nathaniel's unwillingness to stay off campus, and the involvement of the Den Hartogs in allowing Nathaniel on campus.

In addition, the Defendants discredit Den Hartog's argument that he was terminated because of Nathaniel's disability by pointing out that a number of Wasatch campus members suffer from mental disabilities and yet have not been subject to adverse employment decisions. In fact, Den Hartog noted in his Utah Anti–Discrimination General In-

take Questionnaire that "[a]nother faculty member's wife has depression (mental condition), he has not been fired. Another faculty member is bipolar, she has not been fired." Also, the son of the president of the Board of Trustees, Jim Loughlin, has been diagnosed as bipolar.

Defendants have presented a number of undisputed facts establishing that to the extent that Den Hartog was transferred and terminated due to his relationship with Nathaniel, such decisions were based on Nathaniel's misconduct and not his disability. Accordingly, Den Hartog must come forward with some additional facts which present a genuine issue of fact regarding whether Defendants considered Nathaniel's disability in reaching their employment decisions.

In his memorandum in opposition, Den Hartog cites an excerpt from Loftin's deposition as evidence from which a jury could determine that the Defendants' decisions were disability-based. The excerpt at issue is as follows:

Q. [By Mr. Cook] To be fair, and I want to see if I understand the facts, is that one of the motivating reasons in not renewing his contract was because of his involvement in this whole situation involving his son?

A. [By Mr. Loftin] An underlying motivating reason for not ... Yes, for not continuing employment, that definitely had an impact on our decision as we determined which positions to cut.

Q. Put another way, but for the fact that his son was a manic-depressive and created these problems, in all likelihood Mr. Den Hartog's employment would have been continued?

MS. DUNNING: I'm going to object because that is not put a different way from what Mr. Loftin has testified.

MR. COOK: I'm just asking him that.

THE WITNESS: Ask me the question again.

Q. (By Mr. Cook) I will. Had Nathaniel never had this problem—

A. Uh-huh.

Q. —manic depression and the resulting behavioral problems—

A. The behavior.

Q. And the behavioral problems—

A. The manic depression was fine with us, it's the behavior that wasn't.

Q. But absent that behavior, is it your testimony that in all likelihood Mr. Den Hartog's employment would have been continued?

A. Had this not happened at all?

Q. Correct

A. Very possibly, yes.

Loftin could not have been more clear in clarifying that it was Nathaniel's behavior, and not his disability, which led to the nonrenewal of Den Hartog's contract. No reasonable jury could infer from this testimony that Loftin considered Nathaniel's bipolar disorder in reaching employment decisions.

At oral argument, the court specifically asked Den Hartog's counsel to point out any evidence supporting his argument that Defendants improperly considered Nathaniel's disability. Counsel relied on three facts: (1) the transcript from the recorded April 1 meeting in which Loftin used the term "condition"; (2) Loftin's diary notes in which he uses the term "condition"; and (3) the fact that Loftin and other decisionmakers knew of Nathaniel's disability prior to making the decisions.

As for the April 1 meeting transcript, although there are several references to Nathaniel's mental health problems, reading the transcript as a whole the court finds that no reasonable jury could infer that stereotypes about Nathaniel's disability rather than his behavior itself was the reason for the Defendants' decision to terminate Den Hartog. The transcript is rather lengthy, but one example will illustrate the point. Loftin stated on April 1 (within a week of Nathaniel's threats to the Loftin family) that:

I'm talking about perhaps, it might be in the best interest of the school for you not to be here because of your son's condition, because of the possibility of your son's condition being threatening to the community or, uh, you know, it could be the unstability of his condition, you know causing harm somehow to the boarding community.

Although Loftin refers to Nathaniel's "condition" and obviously makes the connection

between Nathaniel's disorder and his propensity to engage in misconduct, Loftin is clear that the reason he is concerned is that Nathaniel presents a threat to the boarding school community based on his actual past behavior and not stereotypical predictions based on his disability.

Similarly, Loftin's diary notes make reference to Nathaniel's "condition," but raise no reasonable inference that the disability itself was the reason for adverse employment decisions. In recording the content of his conversation with the Den Hartogs, Loftin writes that:

> The DenHartogs [sic] shared highlights of the past year or so relative to the manic depressive behavior of their son. Perhaps the first sign of problems was in high school when resigning from the yearbook. However, his condition was not diagnosed until last summer and he was accepted into the Central Utah mental health program under Dr. Harliss and began his lithium regimen.

Loftin is merely explaining information which the Den Hartogs related to him, and he at no time suggests that this disability diagnosis impacted any decisions he made in regard to Den Hartog's employment.

Finally, it is clear that the mere fact that the Defendants were aware of Nathaniel's disability does not create a fact issue about whether that information led to discriminatory treatment. As the Sixth Circuit noted, just because the employer "knew that [the employee] was an alcoholic ... that knowledge does not translate into evidence that alcoholism was the basis for the termination." *Maddox*, 62 F.3d at 848. Furthermore, allowing mere knowledge of a disability to create a fact issue regarding ADA discrimination would be patently unfair to employers and allow disgruntled employees the option of "creating" an ADA claim by simply informing their employers about their disabilities.

In short, the court has thoroughly reviewed the record in this case and concluded that there are no genuine issues of material fact suggesting that the Defendants improperly relied on unfounded stereotypes about Nathaniel's disability in their decisions regarding Den Hartog's employment. Rather the undisputed facts demonstrate that the Defendants, to the extent that they considered Den Hartog's relationship with Nathaniel, relied on Nathaniel's actual behavior and his established propensity for misconduct. *See Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir.1995) (holding no ADA claim where employee fired for diabetic attack because he had "proved" to his employer that he could not monitor his disease). Accordingly, the court must grant Defendants' motion for summary judgment on the ADA claim.[8]

Nonetheless, Den Hartog argues fervently that Defendants wrongly imputed Nathaniel's behavior to him and that Defendants should have dealt directly with Nathaniel—using any number of civil and criminal sanctions—regarding Nathaniel's own behavioral problems. Den Hartog is certainly correct that there are a number of fact issues regarding whether or not the Defendants treated Den Hartog unfairly based on his son's behavior. However, the fact that Defendants may have treated Den Hartog improperly based on Nathaniel's *behavior*, does not render this a *disability* discrimination case within the purview of the ADA. The issue is not whether Den Hartog was treated unfairly, but rather whether Defendants violated the ADA. Issues of fact regarding the fairness of Defendants' decisions are appropriately resolved in the context of Den Hartog's breach of contract claim.

### B. *Den Hartog's Breach of Contract Claim.*

Defendants have moved for summary judgment on Den Hartog's breach of contract

8. Because the court grants summary judgment to the Defendants on Den Hartog's ADA claim, the court does not consider the other ADA issues raised by the parties such as whether the claim regarding Den Hartog's transfer was timely, whether Den Hartog was qualified for the position, whether Den Hartog was a direct threat, whether Nathaniel was a direct threat, whether Wasatch made an accommodation, and whether Wasatch conducted an individualized assessment. Likewise, Den Hartog's motion for partial summary judgment to strike Defendants' Third and Fourth Affirmative Defenses regarding the direct threat defense under the ADA are now moot.

claim arguing that the undisputed facts demonstrate that Defendants decided not to renew Den Hartog's contract because of the elimination of his position and because of his misconduct. Den Hartog, on the other hand, has moved for partial summary judgment to strike the Defendants' Seventh Affirmative Defense contending that the undisputed facts show Defendants had no cause to discharge Den Hartog.

The written contract between Wasatch and Den Hartog provided that Wasatch had "the right to terminate this contract immediately for cause, including but not limited to incompetence, cruelty, negligence, immorality and violation of any other covenants of the agreement." The contract further provides that:

Said EMPLOYEE, in addition, agrees to submit to his proportional part of the internal discipline of the ACADEMY, including compliance with directions given him by the Headmaster or his designated representatives, and to comply with all bylaws and policies of its Board of Trustees. Said EMPLOYEE further agrees to comply with all reasonable requests of superiors and to comply with policies and rules adopted by ACADEMY during term of employment and to carry out the spirit and intent of such policies and regulations....

Wasatch's Faculty Handbook states that "[t]ermination or a decision not to offer a contract for the next school year must be based either on a change in the employment requirements of Wasatch Academy, substandard performance or cause as specified in individual contracts."

Defendants argue that the contract gives them the right to terminate (or not renew) Den Hartog's contract for cause or because of a change in the employment requirements of the school. Defendants contend that the undisputed facts show that Den Hartog's contract was not renewed because the position he held as school historian was eliminated and his former position as a teacher was eliminated. In addition, the Defendants claim that the undisputed facts show that they had sufficient cause to terminate Den Hartog because of critical remarks he made about the school and because of his complicity in allowing Nathaniel on campus in violation of the Headmaster's orders.

■ Having reviewed the facts of this case, the court finds that there are numerous fact issues regarding the breach of contract claim. Although the Defendants claim that Den Hartog was terminated due to the elimination of his job, Loftin admitted in his deposition that absent Nathaniel's behavior Den Hartog "[v]ery possibly" would not have been terminated. This admission creates a fact issue about to what extent Nathaniel's behavior was a motivating force is Den Hartog's termination.

■ Given that Nathaniel's behavior may have been a factor in Den Hartog's dismissal, there is also an issue of fact regarding whether or not the Defendants properly sanctioned Den Hartog for his son's behavior. Defendants can point to a number of facts that raise the inference that Den Hartog facilitated Nathaniel's presence on campus and, thus, violated Wasatch's order—Den Hartog provided his son with unrestricted use of a car, Esther Den Hartog brought her son on campus, Esther stated that she would not prevent Nathaniel from attending family functions in campus housing, and Den Hartog attended a basketball game with his son on campus. Nonetheless, Den Hartog denies that he ever allowed his son on campus. He claims that he is not responsible for the actions of his adult son or his wife. A reasonable jury could conclude that Nathaniel and his mother, but not Den Hartog, violated the order.

■ Furthermore, there is an issue of fact regarding whether the Defendants had cause to terminate Den Hartog because of statements he made to others about Wasatch and Loftin. The Defendants characterize these statements as "critical" and "unprofessional." However, Den Hartog has testified that he merely told others that he was upset about his transfer and did not make critical statements about the school. Only a jury can settle this factual dispute.

■ Finally, even if Den Hartog was fired for cause there is an issue regarding whether Den Hartog's rights as outlined in the Faculty Handbook were violated. The Handbook provides that in "[e]ach case of termination or refusal of contracts for sub-

standard performance or specific cause as outlined in individual contracts, must be substantiated in writing specifying the reasons for the action taken, previous response by the employee in question." Then, the "employee who has been terminated or refused a contract for substandard performance or cause, may appeal, with the full knowledge of the Headmaster, to the President of the Board of Trustees." The parties dispute what action satisfies the requirement that the cause be "substantiated in writing." If the Handbook requires that the employee be given written notice of the reasons for termination (which admittedly was not done), then Den Hartog has a right to present such evidence to the jury to assess damages.

 In short, there are a number of issues of material fact that preclude summary judgment on the breach of contract claim and the defense of "for cause" termination. Accordingly, both Defendants' motion for summary judgment on the contract claim and Den Hartog's motion for partial summary judgment on the Seventh Affirmative Defense are denied.[9]

C. *Den Hartog's Motion in Limine*

 Den Hartog moves this court to exclude from trial a number of items related to Nathaniel:

1. Medical records and other evidence pertaining to Nathaniel;

2. Records of Nathaniel's mental commitment hearing;

3. Police records and reports pertaining to Nathaniel; and

4. Expert opinion testimony of Dr. Lincoln Clark which is based upon the above materials.

Den Hartog argues that these items must be excluded because they were not known or in the possession of Defendants at the time they made their employment decisions and,

therefore, are irrelevant in determining whether those decisions were proper. In addition, Den Hartog claims that this evidence is irrelevant because it all relates to Nathaniel's misconduct and not Den Hartog's.[10]

While it is true that Defendants did not have these *records* at the time of their decisions, it is undisputed that the Defendants knew of many of the events described in the records. In fact, Loftin was personally involved in number of these events. To the extent that Defendants knew of these events and claim to have considered them, the records are properly admitted as official versions of the events and to corroborate the defense, especially if there is any dispute about the details of any events. It would be improper for the court to make a blanket ruling that such records are inadmissible. Den Hartog, of course, will be free to make objections at the time of trial as to any particular evidence which is irrelevant or otherwise inadmissible. Likewise, Den Hartog may request limiting instructions at trial when appropriate.

Finally, Defendants have raised a fact issue regarding whether or not Den Hartog was fired for cause due to his role, if any, in allowing Nathaniel on campus in violation of Loftin's order. Thus, Nathaniel's behavior is very relevant in determining the reasonableness of Loftin's order and whether Den Hartog violated such an order. Den Hartog's argument that Nathaniel's behavior is irrelevant is without merit and the motion in limine is denied.

## IV. *ORDER*

Accordingly, based on the foregoing, and good cause appearing,

IT IS HEREBY ORDERED as follows:

---

9. Having granted summary judgment on the federal ADA claim, the court lacks subject matter jurisdiction over the state breach of contract claim. However, Congress has afforded broad discretion to federal courts to either retain or dismiss state claims in this situation. *See* 28 U.S.C. § 1367(c)(3) (providing district court "*may* decline to exercise supplemental jurisdiction ... if the district court has dismissed all claims over which it has original jurisdiction"); *see also, Edmondson & Gallagher v. Alban Towers*

*Tenants Ass'n,* 48 F.3d 1260, 1265–66 (D.C.Cir. 1995) (holding that under 28 U.S.C. 1367(c), decision as to whether to retain state claims is left to "sound discretion of the district court").

10. Den Hartog has also made several arguments regarding why such evidence is inadmissible against an ADA claim. Since the court has granted summary judgment to the Defendants on the ADA claim, such arguments are now moot.

1. Plaintiff's motion for partial summary judgment to strike Defendants' Seventh Affirmative Defense is denied;

2. Plaintiff's motion in limine is denied;

3. Defendants' motion for summary judgment is granted with respect to Plaintiff's ADA claim;

4. Defendants' motion for summary judgment is denied with respect to Plaintiff's breach of contract claim; and

5. This order will suffice as the court's decision on these motions and counsel need not prepare any further orders.