Joseph C. NIELSEN, individually and on behalf of all similarly situated shareholders of Moroni Feed Company, Plaintiff,

v.

MORONI FEED COMPANY, a Utah corporation, Tim Blackham, individually and as Chairman of the Board of Directors of Moroni Feed Company, David Bailey, individually and as President of Moroni Feed Company, Carol Blain, individually, Frank Cook, individually and as Vice President of Moroni Feed Company, Blake Donaldson, individually, and Parry Olson, individually and as a member of the Board of Directors of Moroni Feed Company, Defendants.

No. 2:95–CV–0910–S.

United States District Court,
D. Utah,
Central Division.

June 27, 1997.

David L. Barclay, Lynn S. Davies, Mark L. McCarty, Russell C. Fericks, Richards, Brandt, Miller & Nelson, Salt Lake City, UT, Nathan R. Hyde, Sandy, Barbara K. Berrett, Weiss, Berrett, Petty, Oscar W. McConkie, Kirton & McConkie, Salt Lake City, UT, for Plaintiff.

Michael R. Carlston, Camille N. Johnson, Stanley J. Preston, Snow, Christensen & Martineau, William J. Hansen, Karra J. Porter, Mark L. Anderson, Christensen & Jensen, Salt Lake City, UT, for Defendants.

## MEMORANDUM DECISION

SAM, Chief Judge.

Before the court are motions for summary judgment submitted by: (1) defendants Moroni Feed Company (MFC), Tim Blackham,

David Bailey, Carol Blain, Frank Cook, and Parry Olson; and (2) defendant Blake Donaldson. Additionally, although he has not filed a separate, formal motion, plaintiff Joseph C. Nielsen requests entry motion for instructions, two motions to strike, and a motion to amend the complaint. The court, having reviewed and considered the parties' briefing, will rule on the motions without the assistance of oral argument, pursuant to D. Ut. 202(d).

## BACKGROUND

The following undisputed facts have been gleaned from the parties' extensive briefing.

MFC, the largest employer in Sanpete County, Utah, is a turkey cooperative whose stockholders consist primarily of turkey growers in several communities of the county. MFC's services include hatching and selling baby turkeys, providing veterinary assistance, mixing and selling turkey feed, and slaughtering, processing and packaging turkeys for market.

Plaintiff was employed by MFC in 1970. He became vice president in 1978 and president and general manager in 1985. At various times during his employment at MFC, plaintiff held such prominent positions in his community as Ephraim City Commissioner, director and president of the Utah Feed Manufacturers' Association, board member of the Utah Manufacturers' Association, chairman of the board of Norbest, Inc., and member of two bishoprics, member of the stake presidency, and stake president in the Church of Jesus Christ of Latter–Day Saints.

Defendant Blackham was MFC's chairman of the board during the relevant time period. Defendant Bailey was MFC's vice president and general manager of the processing plant. He became president of MFC after plaintiff's termination. Defendant Blain was an MFC employee initially hired by plaintiff but supervised by defendant Bailey. Defendant Cook was manager of MFC's feed milling department. He became vice president after plaintiff's termination. Defendant Olson was a member of MFC's board of directors at the time plaintiff was terminated. Defendant Donaldson was an independent insurance agent who provided insurance services for MFC.

While employed by MFC, plaintiff suffered from stress and was afflicted with such ailments as arthritis in his knees, back pain due to maladies of the spine, extensive dental work and oral surgery, numbness in his hands, shingles, and a disorder of the esophagus. For a number of years, as a result of these conditions, plaintiff frequently consulted with several doctors and consumed many prescription medications, including narcotic or codeine-based painkillers.

In the spring of 1993, plaintiff entered the home of defendant Cook. Defendant Cook's daughter, Jennifer, was home alone, dressed in her bathrobe. Her parents were away on MFC business. As Jennifer stepped into the entry hall, she could see a man approaching the front door. Jennifer stated plaintiff walked in without knocking on the door, ringing the doorbell, or otherwise giving her a chance to respond. Plaintiff stated he tapped on the door before entering the home. Jennifer was embarrassed and very uncomfortable because she was in her robe. Plaintiff asked Jennifer where her father was, and she told plaintiff he was out of town.

In April or May of 1994, plaintiff entered Ralph Crosland's home when no one was at home. Carolyn Michie, Mr. Crosland's daughter, who lived across the street from her father, observed a man enter her father's home. Knowing her father was not at home, Ms. Michie went to his home and encountered plaintiff as he was leaving the home. Plaintiff told Ms. Michie he had come to visit her father.

In May of 1994, plaintiff entered the David Cook home. Mr. Cook's daughter, Angela, wearing pajamas, was in her bedroom in the basement when she heard the door open and footsteps in the kitchen and dining room upstairs. She heard no doorbell or knock on the door. As she proceeded upstairs, she encountered plaintiff walking from the rear of her home toward the kitchen. Angela was embarrassed as she was in her pajamas. Plaintiff asked Angela for directions to Dwight Cook's house. Angela was unable to give plaintiff directions but offered to drive him there or look up the address in the phone book. Plaintiff declined Angela's of-

fers of assistance and departed through the back door into the garage.

In May of 1994, plaintiff entered the Kirt Kellett home. Ryan Kellett, Mr. Kellett's son, was standing in the kitchen when he heard the back door open. No one had knocked. Ryan stepped into the hallway to see who was there and was shocked to encounter plaintiff standing in the back hallway. Plaintiff asked Ryan if his father was home, and Ryan told him he was not.

In the spring of 1994 or 1995, plaintiff entered the Brent Peterson home. Mr. Peterson was in his brooder coop when he heard his dogs bark and went to his house. When he entered his home, he found plaintiff in his living room. It did not trouble Mr. Peterson to find plaintiff in his home because they were good friends.

On June 5, 1994, plaintiff entered the Kirt Kellett home when no one was at home. When plaintiff exited the home through the back door into the garage, he saw Todd and Amanda Kellett, Mr. Kellett's children, entering the open garage. Plaintiff told them he was looking for their father.

In June of 1994, plaintiff entered the home of defendant Olson when no one was at home. It was a Sunday, and the Olson family was at church. Mrs. Olson left church early to check on the dinner she was preparing. As she proceeded through her garage, she noticed the door leading from her garage into her house was wide open. After walking through the house, Mrs. Olson encountered plaintiff. Plaintiff told Mrs. Olson he needed to see her husband.

During the last week in June of 1994, while driving past the home of his brother-in-law, defendant Cook, Kirt Kellett saw plaintiff approaching the front door. Mr. Kellett stopped at a gas station within sight of defendant Cook's home. While at the gas station, Mr. Kellett observed plaintiff walk to the rear of defendant Cook's home and try unsuccessfully to open the sliding glass bedroom door. He saw plaintiff try several other doors and go into the garage. Mr. Kellett then returned to his home and telephoned

defendant Cook's house. There was no answer.

In June or July of 1994, plaintiff entered the Bruce Holman home when no one was at home. Mr. Holman was a barber whose shop was next to his home with a separate entrance. When Mrs. Holman came home from work for lunch and walked up the steps to open the door leading from her garage into her house, plaintiff opened the door from the inside. Mrs. Holman stated plaintiff told her he was looking for the barber to get a haircut. Plaintiff stated he was looking for the address of Mr. Holman's mother so he could visit her.

On or about July 5, 1994 [1], plaintiff entered the Thursby home. Tyson Thursby, age 10, was home alone in the family room when plaintiff walked in the front door without knocking or hollering. Tyson did not know plaintiff. Plaintiff asked Tyson if Tyson's mother's brother-in-law, Rex Nielsen, was there, and Tyson told him he was not. Plaintiff stated he saw Rex Nielsen heading in the direction of the Thursby home and needed to see him. Plaintiff stated that, when he approached the Thursby home, he could see Tyson through the glass or screen door, opened the door to ask if Rex was there, and then left.

In late July of 1994, plaintiff first heard that rumors were circulating about him entering homes to obtain drugs. Plaintiff's dentist told him he had heard rumors that "your wife goes in with you into the people's homes and distracts them while you go case the joint for their drugs." Also in late July of 1994, after plaintiff's dentist had told him about the rumors, defendants Bailey and Cook met with plaintiff and informed him they thought he should know that several people had complained to them about plaintiff being in their homes.

During the summer of 1994, defendants Bailey and Cook met with Dr. J. Bruce Harless about plaintiff. During the meeting, Dr. Harless contacted plaintiff's physician, Dr. Kim Bateman, and told him plaintiff may

---

1. Tyson Thursby's affidavit states this incident took place July 5, 1995. Plaintiff claims it happened in 1994. As plaintiff's employment was terminated in April of 1995, the court is inclined to believe 1994 is the correct year. Regardless of the actual date, however, it is undisputed that the incident occurred.

have a drug problem. Defendant Bailey also spoke with Dr. Bateman. Dr. Bateman indicated he would handle the matter.

In August of 1994, at a meeting of MFC growers, plaintiff stood and addressed the group. Plaintiff wanted to clarify that he had not been taken to a drug rehabilitation center. Plaintiff also stated the rumor about him breaking into homes to steal drugs was not true.

In September of 1994, plaintiff again entered defendant Olson's home on a Sunday when the Olson family was at church. Mrs. Olson left church and went home to change into warmer clothes. While Mrs. Olson was in her bedroom, she saw the door swing open and encountered plaintiff. Mrs. Olson stated her blouse was unbuttoned at the time, and she pulled it around her. Plaintiff stated Mrs. Olson was not in a state of undress. Plaintiff told Mrs. Olson he needed to see her husband.

In late 1994, defendant Blackham spoke with plaintiff about the impropriety of entering homes without invitation or permission. Defendant Blackham asked plaintiff not to enter people's homes uninvited, and plaintiff assured defendant Blackham it would not happen again.

On March 27, 1995, plaintiff entered the home of defendant Blain. Defendant Blain's daughter, Stephanie, then 23 years old, was home alone. Stephanie, dressed in her pajamas (shorts and a tee-shirt), was in the basement watching television when she thought she heard a knock on the door. She then heard footsteps upstairs. When she went to see who was there, she encountered plaintiff in the kitchen. Stephanie stated plaintiff was in the act of reaching to open a kitchen cupboard; plaintiff disputes this. Plaintiff asked Stephanie where her father was. As a result of this incident, the Blains filed criminal charges against plaintiff.

On March 30, 1995, at the request of plaintiff's wife, defendants Blackham and Bailey met with plaintiff and his wife at plaintiff's home. During this meeting, they discussed various instances where plaintiff had been in homes uninvited.

At an MFC board meeting on April 4, 1995, plaintiff was questioned about and given an opportunity to explain why he had been found in or attempting to enter the homes of Ralph Crosland, Kirt Kellett, defendant Cook, Bruce Holman, defendant Olson, and defendant Blain. Plaintiff did not deny that he was in these homes and offered his account of what had transpired in each instance. Plaintiff explained his behavior by stating that he had knocked and thought he heard someone invite him in, or he had tapped on the door and stepped in and hollered hello, or it was just his habit to tap on someone's door and enter without waiting for an invitation. Concerning Mr. Kellett's observations of plaintiff around defendant Cook's home, plaintiff stated he was looking for a key defendant Cook had promised to leave him while defendant Cook was out of town. Plaintiff asked the MFC board several times if people were accusing him of stealing drugs from their homes. The board responded that they were not talking about drugs and had no evidence of drugs. At the conclusion of the meeting, defendant Blackham stated there were so many complaints that there had to be a reason why plaintiff was entering homes. He then stated the MFC board would like plaintiff to be evaluated. Drugs were mentioned as one possible explanation or reason for plaintiff's behavior. Plaintiff was placed on leave of absence with pay.

Plaintiff was evaluated at the Dayspring facility from April 7 until April 10, 1995. Although plaintiff was judged fit for duty and not found to be chemically dependent, the question as to why he was entering homes uninvited remained unanswered.

On April 17, 1995, plaintiff met with the MFC board and told them about his Dayspring experience. Defendant Blackham then told plaintiff he needed to gather his managers together and talk to them. The next morning, plaintiff met with the MFC managers, defendant Bailey, defendant Cook, Bob Morley, and Terry Harding, and asked them if they could support him as president. Defendant Bailey could not support plaintiff. Defendant Cook said he didn't know, was not satisfied in his own mind as to why plaintiff had gone into people's homes, and began questioning plaintiff. Bob Morley said he could support plaintiff but was concerned

about the rumors. Terry Harding became emotional and said he did not want plaintiff to go. Ultimately, defendant Blackham told plaintiff they were not getting anywhere, and it would be best if they parted company. On April 20, 1995, the MFC board notified plaintiff it had passed a resolution terminating plaintiff's employment and removing him as president of MFC.

Plaintiff subsequently brought suit against MFC, Tim Blackham, David Bailey, Carol Blain, Frank Cook, Parry Olson, and Blake Donaldson, alleging: (1) discrimination on the basis of perceived disability, in violation of federal and state law; (2) wrongful termination; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) intentional interference with economic relations; (6) a shareholder derivative action; (7) interference with prospective economic relations; (8) negligence; (9) defamation (against defendants individually); (10) defamation (against MFC and certain defendants in their capacities as officers, directors, and/or agents of MFC); and (11) intentional infliction of emotional distress. Jurisdiction is based upon the application of federal statutes plus pendent state law claims.

## SUMMARY JUDGMENT STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper only when the pleadings, affidavits, depositions, or admissions establish there is no genuine issue regarding any material fact, and the moving party is entitled to judgment as a matter of law.

The burden of establishing the nonexistence of a genuine issue of material fact is on the moving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This party, thus, bears the initial responsibility of informing the court of the basis for the motion and identifying those portions of the record which the party believes demonstrate the absence of a genuine issue of material fact. *See id.*

Once the moving party has met this initial burden of production, the burden shifts to the nonmoving party to designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Board of Educ. v. Pico,* 457 U.S. 853, 863, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982).

In summary judgment proceedings, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence" in support of a party's position is insufficient. *Id.* Therefore, the central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505.

## ANALYSIS

I. *Motion for Summary Judgment filed by MFC, Blackham, Bailey, Blain, Cook and Olson*

A. *Discrimination on the Basis of Perceived Disability*

■ Plaintiff first asserts his termination from his position as president of MFC violated the Americans With Disabilities Act (the ADA), specifically 42 U.S.C. §§ 12112 and 12114(b), and the Utah Anti–Discriminatory Act, Utah Code Ann. § 34–35–6, because it was based upon the erroneous perception that he was addicted to and illegally using drugs. *See* Amended Complaint, ¶ 44.

Pursuant to the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Plaintiff asserts he is a qualified individual with a disability and, thus, entitled to ADA protection. In support of his position, plaintiff relies upon 42 U.S.C. § 12114 which provides, in relevant part:

**(a) Qualified individual with a disability**

For purposes of this subchapter, the term "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.

**(b) Rules of construction**

Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who—

(1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use; ...

(3) is erroneously regarded as engaging in such use, but is not engaging in such use

....

█ Plaintiff argues he is a qualified individual with a disability, for ADA purposes, because he was terminated due to the erroneous perception that he was addicted to and illegally using drugs. To establish a prima facie ADA claim, plaintiff must prove: "(1) that [he] is a disabled person within the meaning of the ADA...; (2) that [he] is qualified, that is, [he] is able to perform the essential functions of the job, with or without reasonable accommodation ...; and (3) that the employer terminated [his] employment under circumstances which give rise to an inference that the termination was based on [his] disability." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 361 n. 6 (10th Cir.1995)). "The final prong of the test requires the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision."

*Id.* Although plaintiff's burden is "not onerous," plaintiff's evidence must be such that, "if the trier of fact finds it credible, and the employer remains silent, [he] would be entitled to judgment as a matter of law." *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Defendants contend plaintiff cannot establish a prima facie ADA claim, as a matter of law, because his termination was based not upon any perceived drug problem but upon plaintiff's conduct of repeatedly entering private homes without invitation or permission. The court will, thus, focus upon the third element necessary for plaintiff to sustain his ADA claim.[2]

Defendants argue the undisputed facts demonstrate that defendants took no action concerning plaintiff's employment because of a perception that plaintiff was addicted to drugs. Rather, defendants took adverse action only after plaintiff repeatedly entered homes and continued to do so even after agreeing to stop. Defendants specifically point to the following factual scenario:

— During 1994, plaintiff entered or attempted to enter the homes of Ralph Crosland, Kirt Kellett (twice), defendant Cook, Bruce Holman, and defendant Olson (twice).

— In July 1994, defendants Bailey and Cook informed plaintiff that several people had told them of their concerns about plaintiff being in their homes without invitation or permission.

— Late in 1994, defendant Blackham spoke with plaintiff about the impropriety of entering homes uninvited and asked plaintiff not to do it again. Plaintiff told defendant Blackham it would not happen again.

**2.** Defendants also argue plaintiff is not a qualified individual with a disability and, thus, cannot establish the first element of his prima facie claim because he, in fact, was engaged in the illegal use of drugs. Plaintiff responds that, even if he were found to have used drugs illegally in the past, he is entitled to the protection of the ADA's "safe harbor" provision, i.e., section 12114(b)(1), because, due to his Dayspring experience, he has "successfully completed a supervised drug rehabilitation program." Because it is undisputed that plaintiff was admitted to the Dayspring facility for a "fitness for duty" evaluation to determine if he was chemically dependent, and plaintiff claims he has never been addicted to drugs, plaintiff's argument that he somehow was "rehabilitated" during his three or four days at Dayspring seems incongruous. The court need not reach these issues, however, in view of its conclusion that plaintiff has failed to establish sufficiently the third element of his prima facie claim, i .e., termination on the basis of disability.

— On March 27, 1995, plaintiff entered the home of defendant Blain, and the Blains filed criminal charges as a result.

— On April 4, 1995, plaintiff was questioned about each of the above incidents at an MFC board meeting and asked to explain, in particular, his entry into the Crosland, Kellett, Cook, Holman, Olson, and Blain homes. When plaintiff asked whether people had accused him of stealing drugs, the MFC board responded that they were not talking about drugs.

— The MFC board concluded they would like plaintiff to be evaluated at Dayspring, and plaintiff was evaluated from April 7 until April 10, 1995. Plaintiff's Dayspring evaluation indicated he was fit for duty and not chemically dependent but left unanswered the question as to why he was entering homes. The MFC board terminated plaintiff by official resolution on April 20, 1995.

Additionally, defendants argue that, regardless of disability or perceived disability, an individual may be terminated on the basis of misconduct. *See, e.g., Den Hartog v. Wasatch Academy,* 909 F.Supp. 1393, 1401 (D.Utah 1995) ("This court agrees with the majority of Circuit Courts that Congress, in enacting the ADA, intended to prohibit unfair stereotypes about the disabled but not to shield the disabled from the consequences of misconduct."); *Maddox v. University of Tennessee,* 62 F.3d 843, 848 (6th Cir.1995) ("Employers subject to the Rehabilitation Act and ADA must be permitted to take appropriate action with respect to an employee on account of egregious or criminal conduct, regardless of whether the employee is disabled.").

These undisputed facts show plaintiff was entering homes, for whatever reason, during 1994, and defendants were aware of this conduct. Defendants Bailey and Cook informed plaintiff that people were concerned about his entry into their homes, and, later, MFC's CEO, defendant Blackham, asked him to stop this behavior. However, no adverse employment action was taken against plaintiff until 1995 when he, again, entered a home, and criminal charges were filed as a result. Moreover, plaintiff was terminated despite the Dayspring evaluation which concluded he was fit for duty and not chemically depen-

dent. The court, therefore, concludes that, based upon this undisputed factual summary, no fair-minded jury could conclude that plaintiff was terminated because he was perceived to be illegally using drugs rather than his continued unauthorized entry into private homes.

Plaintiff, however, asserts additional facts which he argues present genuine issues of fact as to whether defendants actually terminated plaintiff because of an erroneous perception of illegal drug use.

Plaintiff contends defendant Bailey, who became president of MFC after plaintiff's termination, kept a journal of notes relating to plaintiff, his behavior, the resulting circumstances, and defendant Bailey's concerns. Defendant Bailey recorded: "After the events of last few days concerning situation with Joe Nielsen, I feel I need to write down the events as they occurred 3–4 weeks ago concerning the rumors etc. of Joe being in homes un-expectedly." Bailey Journal, p. 5. Plaintiff cites the deposition testimony of defendant Olson concerning how the MFC board used defendant Bailey's journal. Defendant Olson testified the MFC board met in late March of 1995, after plaintiff had entered defendant Blain's home. At that time, defendant Bailey used his journal to apprise the board of the situation because

the history with Mr. Nielsen's entering into those homes was long and involved . . . and so we held that meeting to go over the circumstances with Joe, over his behavior for the—in March it was for an almost one-year period of time, almost one year, and to review those—that behavior with the other three board members that simply had not been brought up to speed on the incidences [sic].

Parry Olson Depo. p. 124. Defendant Olson stated defendant Bailey "used his journal to remember facts and dates and names." *Id.* at p. 126. Defendant Olson further testified defendant Bailey explained to him that "when those type of incidences [sic] first came to light he really kind of discounted them, but as they continued to persist he decided he better begin to document names and times and places." *Id.* Although the MFC board was aware of and apparently

used defendant Bailey's journal as a reference when discussing plaintiff's situation and behavior, neither the journal itself nor the testimony of defendant Olson about its use provide factual support for the position that plaintiff was ultimately terminated because of the perception of drug abuse.

Plaintiff contends that, with the knowledge and encouragement of defendant Blackham, defendants Bailey and Cook met with Dr. J. Bruce Harless, a physician dealing with alcohol and substance abuse, and falsely accused Mr. Nielsen of having a drug problem that was interfering with Mr. Nielsen's ability to perform his job and causing MFC to experience problems with Norbest. Dr. Harless testified defendants Bailey and Cook met with him out of their sincere concern for plaintiff. Defendants expressed concern for plaintiff's welfare, his job performance, and his possible drug problem and were interested in resolving any problem plaintiff might have and seeing that he obtained help. *See* Harless Depo., pp. 21–25. Although Dr. Harless's testimony indicates defendants Bailey and Cook were concerned that plaintiff had a drug problem, it does not support a finding that plaintiff's termination was due to suspected drug use. In fact, Dr. Harless stated "there was no motivation that I could discern other than that it was out of concern for the welfare of Mr. Nielsen." *Id.* at p. 64. Moreover, defendants' meeting with Dr. Harless took place during the summer of 1994, almost one year before plaintiff's employment was terminated.

Plaintiff contends defendant Bailey told Doug Neeley plaintiff had admitted to defendant Bailey that he had a drug problem. However, Mr. Neeley testified defendant Bailey never indicated whether he, personally, felt plaintiff had such a problem. *See* Neeley Depo., pp. 42–43. Mr. Neeley also testified defendant Bailey told him that, in essence, defendant Bailey had been doing plaintiff's job because plaintiff "wasn't capable of doing it, or he couldn't be trusted to do it," and this situation was causing stress for defendant Bailey. *Id.* at p. 43. Mr. Neeley stated he got the impression that plaintiff could not do his duties because of a drug problem. Moreover, Mr. Neeley testified defendant Bailey asked him "what I thought about the whole situation, what I thought

other growers that I associate with would think about terminating Joe." *Id.* at p. 45. Mr. Neeley's testimony, thus, could indicate that defendant Bailey thought plaintiff had a drug problem and should be terminated.

Plaintiff contends defendant Bailey told plaintiff's wife, in front of plaintiff, that he thought plaintiff was entering homes to acquire drugs. Such a comment by defendant Bailey, however, does not indicate plaintiff was terminated due to a perceived drug problem. Rather, it indicates defendant Bailey thought drugs were one explanation for plaintiff's uninvited entry into private homes.

Plaintiff contends defendant Bailey admitted to Donald Shand, an MFC shareholder, that plaintiff was terminated because he had a drug problem and was entering homes to steal drugs. However, Mr. Shand testified about his conversation with defendant Bailey as follows: "Well, basically, he just put things in order of what had happened and to bring it to the termination of Joe Nielsen. *And it was due to homes being entered.* He made the comment he had talked to Joe on occasions about the problem." Shand Depo., p. 26 (emphasis added). Mr. Shand added that defendant Bailey said plaintiff "was supposedly looking for drugs in these homes. That's *the reason* he was entering these homes was looking for drugs." *Id.* at p. 29 (emphasis added). Moreover, the following exchange occurred at Mr. Shand's deposition:

> Q. Did anyone ever tell you that the board was concerned about Joe, that they—because of these incidents of him going into people's homes that they had lost confidence in him or lost some trust in him?
>
> A. Basically, that's what the conversation Dave Bailey and I had. That's the way Dave felt.
>
> Q. Okay. And did he tell you that was a—that was the basis for the decision to let him go?
>
> A. Yes.

*Id.* at pp. 48–49. Mr. Shand's testimony does not support plaintiff's position that he was terminated because of a perceived drug problem. On the contrary, although it demonstrates that defendant Bailey may have thought drugs were the reason behind plain-

tiff's repeatedly entering the various homes, it is more supportive of defendants' position that plaintiff was actually terminated because he was entering homes.

Plaintiff contends defendant Olson told plaintiff many times that he thought plaintiff was addicted to drugs and was entering homes to steal drugs. Plaintiff also claims defendant Olson told plaintiff that defendant Olson had laid traps around his house in an attempt to catch plaintiff stealing drugs. Again, although such comments by defendant Olson may indicate his personal belief as to why plaintiff was entering homes, they do not indicate that plaintiff was actually terminated because of any perceived drug abuse. Plaintiff cites the deposition testimony of defendant Olson's wife in support of the allegation that defendant Olson set traps for plaintiff. While Mrs. Olson denies her husband set traps, when asked if defendant Olson ever told her why plaintiff was fired, she testified:

> [H]e felt Joe was fired because the management, that there were enough incidents that happened that were questionable about why Joe was where he was around people's homes that the management and employees at Moroni Feed were losing confidence in him because of what was going on, and that he did not admit to having any problem.

Judith Olson Depo., p. 136.

Plaintiff contends the MFC board consulted with Dr. Stephen D. Brown, a local psychologist, about the possibility of plaintiff entering homes for the purpose of acquiring drugs. Subsequently, the MFC board requested that plaintiff be evaluated at the Dayspring facility. Dr. Brown testified he met with the MFC board because "they were wondering what to make out of the behavior of Joe entering the home," i.e., defendant Blain's home, and they wanted "an understanding as to what might be the possible explanations." Brown Depo., pp. 56–57. The MFC board told Dr. Brown there were occasions when plaintiff entered other homes. A drug problem was mentioned as a possible reason for plaintiff's repeated entry into the homes. The MFC board ultimately decided plaintiff should go to the Dayspring facility for a "fitness for duty" evaluation to see if plaintiff had a chemical dependency problem.

The MFC board's consultation with Dr. Brown and the decision to have plaintiff evaluated for chemical dependency suggest an attempt to understand why plaintiff was entering private homes without invitation or permission. Such facts do not support plaintiff's position that he was terminated because of a perceived drug problem. In fact, as noted above, plaintiff's employment was terminated despite the fact that the Dayspring staff found him "fit for duty" and not chemically dependent.

Plaintiff contends, citing to the deposition testimony of defendant Olson, that he was terminated shortly after his discharge from Dayspring before MFC had received any written report from the facility. Although defendant Olson testified plaintiff was, in fact, terminated before the MFC board received any formal, written findings from Dayspring, defendant Olson acknowledged that MFC's legal counsel had "verbal communications" from Dayspring personnel that plaintiff had undergone an extensive evaluation, was fit for duty, and had no chemical dependency. Parry Olson Depo., pp. 170–71. Thus, the fact that plaintiff was discharged after a favorable evaluation at Dayspring actually cuts against his argument that he was terminated because of a perceived drug problem. Plaintiff further contends defendant Olson questioned the Dayspring report and had a hard time with it. However, according to defendant Olson's wife, to whose deposition testimony plaintiff cites for support, defendant Olson had a hard time with the Dayspring report because "he wanted a problem to come up so it could be corrected so that Joe would not be fired, so that he could continue and gain the confidence back of those employees under him." Judith Olson Depo., p. 137. Moreover, defendant Olson testified plaintiff was still terminated despite the Dayspring report because "the confidence level among the board and other managers and—had just completely broke down with Mr. Nielsen, that his—*it still didn't explain his entry into those homes,* ... that his behavior—his integrity was just gone, just completely disappeared." Parry Olson Depo., p. 171 (emphasis added).

Plaintiff contends that, at the time of his termination, no reason was given for his termination, and no official reason has ever been given for his termination. Even if the court assumes the truth of these statements, however, they are insufficient to raise a genuine issue of fact as to whether plaintiff was terminated because of a perceived drug problem.

After considering the parties' arguments and reviewing the record, the court is of the opinion that plaintiff has not set forth evidence sufficient to warrant judgment, as a matter of law, that his alleged disability of perceived drug abuse was actually a determining factor in his termination.[3] Rather, the undisputed facts reveal plaintiff's employment was terminated because of his repeated conduct of entering private homes without permission or invitation. Although plaintiff may point to some evidence that some of the defendants may have been concerned about a drug problem, or even believed plaintiff had a drug problem, plaintiff has failed to show that defendants acted on that belief by taking adverse action against him. See Den Hartog, 909 F.Supp. at 1405 (defendants' knowledge of a disability "does not create a fact issue about whether that information led to discriminatory treatment"). Significantly, plaintiff's employment was terminated just ten days after his discharge from the Dayspring facility, despite a *favorable* report from Dayspring that he was fit for duty and *not* chemically dependent. In fact, the undisputed facts reveal that, even though some defendants may have suspected a possible drug problem as early as the summer of 1994, defendants did not terminate plaintiff at that time and on that basis. Instead, plaintiff's employment was terminated almost a year later and only after plaintiff was aware that members of MFC's board knew about his uninvited entry into various homes in the community and had discussed this with him; MFC's CEO, defendant Blackham, specifically asked plaintiff not to continue this unauthorized entry into homes; plaintiff agreed to stop this practice; and plaintiff, again, entered a home, resulting in criminal

charges being filed against him for the first time. The court believes the facts indicate that such misconduct, particularly by MFC's president who was also a prominent member of the local community, led to plaintiff's termination, notwithstanding any perceived disability of drug abuse. See Den Hartog, 909 F.Supp. 1393; Maddox, 62 F.3d 843. The court concludes a fair-minded jury presented with this evidence could not return a verdict in plaintiff's favor on this claim.

Accordingly, as plaintiff has failed to establish MFC terminated him because of a disability, a required element of his prima facie ADA claim, the court hereby GRANTS defendants' motion for summary judgment as to plaintiff's ADA claim and DENIES plaintiff's request for entry of summary judgment in his favor as to this claim. Having granted summary judgment on the ADA claim, the basis for federal jurisdiction, the court declines to exercise jurisdiction over the remaining state law claims and hereby dismisses them.

## II. *Remaining Pending Motions*

In addition to defendants' motion for summary judgment analyzed above, a number of other motions were submitted for the court's consideration.

1. Plaintiff requested entry of summary judgment in his favor in conjunction with his opposition to defendants' motion for summary judgment. As noted above, plaintiff's request is denied as to his ADA claim, and plaintiff's remaining pendent state law claims are dismissed.

2. Defendant Blake Donaldson moved for summary judgment on plaintiff's claims against him for defamation and the intentional infliction of emotional distress. Defendant Donaldson's motion is moot in view of the court's dismissal of plaintiff's pendent state law claims.

3. Plaintiff filed a motion for instructions in the event the court determined clarification of the extensive briefing submitted was

**3.** The court concludes Mr. Neeley's deposition testimony is the only evidence which might be construed to raise an issue of fact concerning whether plaintiff's employment was terminated

due to a perceived drug problem. However, a "scintilla of evidence" supporting plaintiff's position cannot withstand summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

warranted. The court reviewed the voluminous briefing filed, giving due consideration to all parties, and concluded no further briefing was needed.

4. Plaintiff moved to strike the "Agreement for Plea in Abeyance," set forth as an exhibit to the Reply Memorandum in Support of Motion for Summary Judgment by Defendants Moroni Feed Company, Tim Blackham, David Bailey, Carol Blain, Frank Cook and Parry Olson, as well as all references and arguments concerning the Agreement and the proceedings in relation thereto. Plaintiff also moved to strike portions of the Affidavit of Mary Gibson as inadmissible hearsay. The court considered plaintiff's motions, gave what consideration it deemed appropriate to the Agreement and the Gibson affidavit in reaching the decision outlined above, and, thus, hereby. denies plaintiff's motions to strike.

5. Plaintiff moved to amend the complaint, if the court found it necessary, to include all defamatory statements discovered subsequent to the filing of the Amended Complaint, including all statements made by defendant Donaldson after it was filed. Plaintiff's motion is moot in view of the court's dismissal of plaintiff's defamation claims.

## CONCLUSION

In sum, the motion for summary judgment submitted by defendants Moroni Feed Company (MFC), Tim Blackham, David Bailey, Carol Blain, Frank Cook, and Parry Olson is granted as to plaintiff's ADA claim. In view of the dismissal of the federal ADA claim, the court declines to exercise jurisdiction over the remaining pendent state law claims and dismisses them also. Other motions submitted by the parties have been resolved as outlined above.