# UNITED STATES COURT OF APPEALS
## Tenth Circuit
## Byron White United States Courthouse
## 1823 Stout Street
## Denver, Colorado 80294
## (303) 844-3157

Patrick J. Fisher, Jr.                                                 Elisabeth A. Shumaker
Clerk                                                          Chief Deputy Clerk

December 15, 1997

**TO:**    ALL RECIPIENTS OF THE CAPTIONED OPINION

**RE:**    96-4040 Hartog v. Wasatch Academy
          October 28, 1997 by The Honorable David M. Ebel

Please be advised of the following correction to the captioned decision:

On page 28, in the fifth sentence of the paragraph beginning "Further, any such sharp dichotomy..." there is a typographical error. Please substitute "establishes" for "establish" so that the sentence reads: "The availability of these affirmative defenses establishes that there are certain levels of disability-caused conduct that need not be tolerated or accommodated by employers."

Please make the correction to your copy.

Very truly yours,

Patrick Fisher, Clerk

Susie Tidwell
Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

OCT 28 1997

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

HOWARD DEN HARTOG,

      Plaintiff-Appellant,

v.

WASATCH ACADEMY and JOSEPH
LOFTIN,

      Defendants-Appellees.

No. 96-4040

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 94-CV-1097W)**

---

Stephen W. Cook, Salt Lake City, Utah, argued the cause for the Plaintiff-Appellant.

Elizabeth T. Dunning, Salt Lake City, Utah, argued the cause for the Defendants-Appellees.  Brett J. DelPorto and Carolyn Cox, Salt Lake City, Utah, assisted on the briefs.

---

Before **EBEL, HOLLOWAY,** and **MURPHY**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Plaintiff-Appellant Howard Den Hartog ("Den Hartog") was discharged by defendant-appellee Wasatch Academy ("Wasatch"), a boarding school where Den Hartog had been teaching and working for over twenty-five years.  He was discharged because

his adult son Nathaniel, who suffers from bipolar affective disorder, attacked and threatened several members of the Wasatch community, including threats to the headmaster's two children, over a one-year period. Den Hartog sued Wasatch and its headmaster, alleging violation of the Americans with Disabilities Act ("ADA") and breach of contract. The district court granted the defendants' motion for summary judgment on the ADA claim, but allowed the breach of contract claim to proceed. After the district court denied Den Hartog's motion in limine to suppress certain evidence, a jury rendered a verdict in favor of the defendants on the contract claim. Den Hartog now appeals both the district court's grant of summary judgment on the ADA claim and its denial of his motion in limine.

We hold that the ADA allows an employer to discipline or discharge a non-disabled employee whose disabled relative or associate, because of such relative or associate's disability, poses a direct threat to the employer's workplace. Because there is no genuine dispute of fact on this record that Den Hartog's son, Nathaniel, posed such a threat to the workplace at Wasatch, we conclude that the discharge of Den Hartog did not violate the ADA. Accordingly, we affirm.

**BACKGROUND**

Because this is an appeal from a grant of summary judgment, the following facts are set forth in the light most favorable to Den Hartog, the non-movant. See Kaul v.

2

Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  All reasonable inferences from the factual record have been drawn in favor of Den Hartog.

Defendant Wasatch is a private boarding school for students in the ninth through twelfth grades, located in Mt. Pleasant, Utah.  In recent years, its student body has numbered approximately 160 students, and it has employed about 45 full-time staff and faculty members.  Mt. Pleasant is a small town, consisting of less than 2½ square miles and approximately 2,000 residents.  Co-defendant Joseph Loftin ("Loftin") has served as headmaster for Wasatch from 1988 to the present.  During the times at issue, Loftin lived on campus with his wife and three children.

Except for two years during which he taught elsewhere, plaintiff Howard Den Hartog was employed by Wasatch Academy from 1964 until July 1994, pursuant to a series of one-year contracts.  During that period, Den Hartog worked as a teacher, in the buildings and grounds department, and as a school historian.  In accordance with Wasatch's general policy requiring full-time faculty to live on campus, Den Hartog lived on the Wasatch campus with his wife and four children every year that he taught there.

Den Hartog's youngest child, Nathaniel Den Hartog ("Nathaniel"), was born in December 1971.  Nathaniel lived with his parents until he graduated from Wasatch in June 1990.  During the 1990-91 school year, Nathaniel went away to college.  However, Nathaniel did not return to college the next year, but instead lived on the Wasatch campus with his parents.

3

In July 1992, Den Hartog took Nathaniel to Dr. John Merriweather, a psychologist in private practice in Mt. Pleasant. Dr. Merriweather tentatively diagnosed Nathaniel as having "bipolar affective disorder" (formerly called "manic depressive psychosis"), and recommended that Nathaniel be hospitalized and treated. Accordingly, Nathaniel was admitted to the Western Institute of Neuropsychiatry in Salt Lake City on July 20, 1992, where Dr. Merriweather's diagnosis was confirmed and Nathaniel was treated with lithium. Nathaniel was discharged on July 30, 1992, and returned to his parents' home on the Wasatch campus. At that time, Loftin was aware of Nathaniel's diagnosis and at some point became aware of Nathaniel's lithium treatment. Upon Nathaniel's return, Loftin hired him to do part-time work on campus including yard work, painting, and assisting in the day care center.

Around November, 1992, Nathaniel moved to California. However, after two months there, he stopped taking his lithium and as a result suffered a manic episode. In January, 1993, the police found Nathaniel selling his possessions in a grocery store parking lot. Following that incident, his mother flew to California and brought him back to Wasatch, where Loftin once again hired him to do part-time work on campus.

During early 1993, when Nathaniel was twenty-one years old, he developed "close ties" with Loftin's sixteen-year-old son Travis. On March 12, 1993, Nathaniel took Travis to Provo, Utah, without the Loftins' knowledge, and attempted to have Travis admitted to Charter Canyon Hospital, a psychiatric hospital there. When a hospital

4

employee called Joseph Loftin, Loftin went to Provo to pick up Travis. Before Loftin arrived, Nathaniel left the hospital without Travis.[1]

Two days later, Nathaniel telephoned the Loftin home several times, looking for Travis. Nathaniel told Loftin that he would slit his own wrists if Loftin did not put Travis on the phone. Loftin, in response, called both the police and Nathaniel's counselor Brian Whipple. That same evening, Nathaniel visited his treating psychiatrist, Dr. J. Bruce Harless, to discuss these phone calls. At this visit, Nathaniel told Dr. Harless that he really had no intention of harming himself, but was merely attempting to coerce the Loftins into disclosing Travis's location.

On March 18, 1993, the Loftins found a number of messages from Nathaniel on their answering machine. In one of these messages, while speaking in a tone of voice which scared Loftin and which Dr. Harless "readily perceived as being threatening," Nathaniel stated that the Loftins should keep a very close eye out on their four-year-old daughter, Allison. In another message, Nathaniel said that he had drained quarts of blood from his body recently, and offered to show this blood to Loftin to prove he was "serious."

After listening to the recorded messages, Loftin called the police, who listened to the messages and told Loftin to take the threats seriously. The police also called Dr. Harless. Nathaniel's parents were then contacted. Although the Den Hartogs agreed to

---

[1]It is unclear whether Nathaniel had initiated the trip to Charter Canyon Hospital, or had driven there at Travis's request.

take Nathaniel to a hospital, they were unable to coax or coerce Nathaniel out of their house. Consequently, they called the police, who transported Nathaniel to the Utah Valley Regional Medical Center, where Nathaniel was temporarily admitted. The next day, at the request of Dr. Harless, Loftin applied for Nathaniel to be involuntarily committed to an institution.

On March 31, 1993, a Utah state judge determined that Nathaniel posed "an immediate danger of physical injury" to himself or others, and ordered his commitment to the custody of the Utah State Division of Mental Health for six months.

The next day, April 1, 1993, Den Hartog and his wife Esther met with Loftin and others to discuss the situation. The Den Hartogs recorded the meeting. At the meeting, Loftin repeatedly told the Den Hartogs that he did not want Nathaniel on campus because of his threatening behavior. Loftin also said that if Nathaniel's condition resulted in the Den Hartogs being unable to live at Wasatch, then Den Hartog might be terminated. Esther Den Hartog responded that "if we lived here [on campus] and we were having a Christmas celebration with our family we would not say, Nathaniel, you cannot come home because Joe Loftin says you cannot be here." Den Hartog did not object to this statement.

On April 16, 1993, the Wasatch Board of Trustees met and voted unanimously to:

endorse the action of the Headmaster, President of the Board, and the Executive Committee in this matter: essentially
    1. Restraining order on Nathaniel Den Hartog

6

2. Apartment in [Salt Lake City] for Esther and Nathaniel for an undetermined period

3. If necessary, pay out their contract if they must leave the community.

Pursuant to this vote, Wasatch rented an apartment in Salt Lake City for Nathaniel and his mother to live in after Nathaniel was released. Two Wasatch Trustees visited the Den Hartogs in their home the next day, to inform them of the Board's decision. No restraining order was ever obtained against Nathaniel.

Despite having been remanded to state custody for six months on March 31, Nathaniel was released from the Utah Valley Regional Medical Center on April 19, 1993. Within a week of his release, Nathaniel visited Mt. Pleasant, where he came onto the Wasatch campus. Several Wasatch Trustees received calls from staff and faculty who were concerned about Nathaniel's presence. Loftin became concerned that as long as Den Hartog worked and lived on campus Nathaniel would continue visiting. As a result, on May 14, 1993, Wasatch assigned Den Hartog to spend the 1993-94 school year writing a school history from Wasatch's development office in Salt Lake City. Den Hartog was to receive his full salary plus a living allowance to pay for a home, utilities, and food.

In August, 1993, Nathaniel enrolled in Snow College and moved to Ephraim, Utah, twenty miles from Mt. Pleasant. Den Hartog provided Nathaniel with a car and placed no restrictions on where Nathaniel could go. On one occasion Nathaniel drove to the Wasatch campus to attend a basketball game which his father was attending. Then, on Christmas Eve, 1993, and on another occasion the following week, Nathaniel went to

7

the Loftin home in an attempt to see Travis Loftin. By that time, Nathaniel had dropped out of Snow College.

On January 24, 1994, Nathaniel and an accomplice battered Byron Bond, a former schoolmate of Nathaniel's, in Bond's home in Mt. Pleasant. Bond sustained several broken ribs and was treated in the hospital. After Bond was released from the hospital, he informed Loftin of the battery and warned him that during the attack Nathaniel had stated that he planned to "get" Loftin next. Nathaniel was arrested for aggravated assault, booked into Sanpete County Jail, and then sent to the Utah State Hospital in Provo for a competency evaluation.

In February, 1994, while Nathaniel was hospitalized, Loftin decided not to renew Den Hartog's contract for the next year. On March 4, 1994, Loftin met with Den Hartog and told him that his contract would not be renewed because the school historian position, which Den Hartog then held, was being eliminated. Although Loftin told Den Hartog that the reason for non-renewal was the elimination of his position, Loftin testified in his deposition that absent Nathaniel's behavior Den Hartog "[v]ery possibly" would still be employed by Wasatch.

Den Hartog filled out an intake form with the Utah Anti-Discrimination Division on April 4, 1994. Then, on April 11, 1994, Den Hartog filed a complaint of discrimination with both the Utah Anti-Discrimination Division and the federal Equal Employment Opportunity Commission ("EEOC").

On May 16, 1994, after being found competent to stand trial, Nathaniel was discharged from the Utah State Hospital. He eventually pled guilty to assault and was sentenced to one year of probation. Loftin was unsuccessful in having Nathaniel prohibited from going on the Wasatch Academy campus as a condition of his probation. From his May 16, 1994 release through August, 1995, Nathaniel lived with his parents in Salt Lake City.

On November 10, 1994, Den Hartog sued Wasatch and Loftin in federal district court, alleging violations of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12117 (1994), and breach of contract under Utah law. In their answer, the defendants raised as affirmative defenses that they had properly terminated Den Hartog's employment because he and/or Nathaniel were "direct threats" under ADA Section 12113(b), and that Den Hartog's claims stemming from his transfer to Salt Lake City were time-barred under 42 U.S.C. §§ 12117, 2000e-5 (1994).

Den Hartog then filed a motion for partial summary judgment to strike the defendants' affirmative defenses concerning any "direct threat," and a motion in limine to exclude Nathaniel's medical records; evidence of his behavior and his mental commitment hearing; police records and reports concerning his actions; and the expert testimony of Dr. Lincoln Clark regarding Nathaniel's behavior and mental state. Wasatch and Loftin, in turn, moved for summary judgment on both the ADA and contract claims.

9

The district court, which exercised jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367(a) (1994), granted summary judgment in favor of Wasatch and Loftin on the ADA claim, and correspondingly denied Den Hartog's motion for partial summary judgment on that claim as moot. See Den Hartog v. Wasatch Academy, 909 F. Supp. 1393, 1405 n.8 (D. Utah 1995). The court denied Wasatch and Loftin's motion for summary judgment on the contract claim, and also denied Den Hartog's motion in limine to exclude certain evidence. See id. at 1407. Consequently, it exercised its discretionary supplemental jurisdiction under 28 U.S.C. § 1367(a) (1994), and allowed the state law contract claim to be tried in federal court. See id. at 1407 n.9.

In December, 1995, the contract claim was tried before a jury, which returned a verdict in favor of the defendants. The district court entered a judgment of no cause of action on January 16, 1996. Den Hartog now appeals: (1) the district court's grant of summary judgment in favor of Wasatch and Loftin on the ADA claim; (2) its denial of Den Hartog's motion for partial summary judgment on that claim; and (3) its denial of his motion in limine prior to the contract claim being tried. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291 (1994), and affirm.

**DISCUSSION**

We review a grant of summary judgment de novo. See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). We apply the same standard under Fed. R. Civ. P. 56(c) used by the district court: we determine whether a

genuine issue of material fact was in dispute, and, if not, whether the substantive law was correctly applied.  Id.

## I.  BIPOLAR DISORDER AS A DISABILITY UNDER THE ADA

As a threshold matter, we must consider whether "bipolar affective disorder" is a disability under the ADA, as was assumed without discussion by the district court.[2]  See Den Hartog, 909 F. Supp. at 1400.  The ADA defines "disability" to include "a mental impairment that substantially limits one or more . . . major life activities. . . ."  42 U.S.C. § 12102(2)(A) (1994).  Pursuant to its statutory authority to issue regulations to carry out the ADA, 42 U.S.C. § 12116 (1994), the Equal Employment Opportunity Commission ("EEOC") has further refined the definition of "disability" to mean "any mental or

_____

[2]Bipolar disorder has been defined as:

> a psychosis involving a mood disorder characterized by swings from mania to depression.  Mania is characterized by elevated mood and associated behavioral responses.  Characteristics of mania are hyperactivity, optimism, flamboyance, loud, pressured speech, garrulousness, distractibility, delusions of grandeur, disorganized behavior pattern, and poor judgment.  Depression is characterized by lowered mood state and related behavior.  Characteristics of depression are sadness, hopelessness, feelings of guilt and worthlessness, social withdrawal, psychomotor retardation and vegetative somatic symptoms including anorexia, weight loss, and insomnia.  The disability experienced from bipolar disorder ranges from mild to severe.

Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 160-61 n.2 (5th Cir.), cert. denied, 117 S. Ct. 586 (1996) (citing Alan Balsam, M.D. & Albert P. Zabin, Disability Handbook 628-29 (1990)); accord Williamson v. Ward, 110 F.3d 1508, 1515 n.9 (10th Cir. 1997) ("Bipolar disorder is a mood disorder marked by alternating manic and depressive episodes.") (citing 1 J.E. Schmidt, M.D., Attorneys' Dictionary of Medicine B-76 (1996)).

11

psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h)(2) (1996). In a recent compliance manual, the EEOC expressly characterized bipolar disorder as a disability under the ADA. EEOC Enforcement Guidance: Psychiatric Disabilities and the Americans With Disabilities Act, 2 EEOC Compl. Man. (BNA), filed after Section 902, at 15 ¶ 1 (Mar. 25, 1997).

Applying the statutory definition and the EEOC's guidance, every appellate court which has considered the question has held or assumed that "bipolar disorder" is a mental disability covered under the ADA, at least if it is sufficiently severe, as was the case here.[3] See Birchem v. Knights of Columbus, 116 F.3d 310, 312, 313-14 (8th Cir. 1997); Bultemeyer v. Fort Wayne Community Sch., 100 F.3d 1281, 1284 (7th Cir. 1996); Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 160-61 (5th Cir.), cert. denied, 117 S. Ct. 586 (1996). We agree. We therefore proceed to analyze Den Hartog's claims under the framework of the ADA.

## II.    THE ASSOCIATION PROVISION OF THE ADA

### A. General Discussion

As the district court noted, "Den Hartog's ADA claim is unique in that it is based on the rather new and undeveloped 'association discrimination' provision of the ADA."

---

[3]Indeed, in addition to the published opinions addressing this subject, two other courts (including this court), in unpublished orders, have assumed bipolar disorder to be a disability covered under the ADA. See Keoughan v. Delta Airlines, Inc., No. 96-4072, 1997 WL 290961, 113 F.3d 1246 (10th Cir. May 27, 1997) (table); Carrozza v. Howard County, Md., No. 94-1593, 1995 WL 8033, 45 F.3d 425 (4th Cir. Jan. 10, 1995) (table).

Den Hartog, 909 F. Supp. at 1399-1400.  Title I of the ADA, which governs employment

relationships, generally provides that "[n]o covered entity[4] shall discriminate against a

qualified individual with a disability because of the disability of such individual in regard

to . . . discharge of employees . . . and other terms, conditions, and privileges of

employment."  42 U.S.C. § 12112(a) (1994) (footnote added).  This provision, standing

alone, would provide no protection to Den Hartog, who does not suffer from any

disability.

Section 102(b)(4) of the ADA, however, defines "discriminate" to include

"excluding or otherwise denying equal jobs or benefits to a qualified individual *because*

*of the known disability of an individual with whom the qualified individual is known to*

*have a relationship or association*."  42 U.S.C. § 12112(b)(4) (1994) (emphasis added)

(the "association provision").   A family relationship is the paradigmatic example of a

"relationship" under the association provision of the ADA.  29 C.F.R. § 1630.8 (1996).

The association provision has been the subject of very little litigation, and none in

this court prior to the present case.  It was apparently inspired in part by testimony before

House and Senate Subcommittees pertaining to a woman who was fired from her long-

held job because her employer found out that the woman's son, who had become ill with

AIDS, had moved into her house so she could care for him.  See H.R. Rep. No. 101-485,

---

[4]It is undisputed that Wasatch and Loftin are "covered entities" within the meaning of 42
U.S.C. §§ 12111(2), 12111(5) (1994).

pt. 2, at 30 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 312 (citing this testimony as evidence of the need for the association provision).

By the time the ADA was enacted, two separate House Committees had reported favorably on the bill (H.R. 2273), and had issued Committee Reports describing certain intended applications (and unintended misapplications) of the association provision. The House Committee on Education and Labor posed the following pair of hypotheticals to illustrate the association provision's parameters:

> [A]ssume, for example that an applicant applies for a job and discloses to the employer that his or her spouse has a disability. The employer believes the applicant is qualified for the job. The employer, however, assuming without foundation that the applicant will have to miss work or frequently leave work early or both, in order to care for his or her spouse, declines to hire the individual for such reasons. Such a refusal is prohibited by this subparagraph.
>
> In contrast, assume that the employer hires the applicant. If he or she violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the spouse. The employer need not provide any accommodation to the nondisabled employee. The individuals covered under this section are any individuals who are discriminated against because of their known association with an individual with a disability.

H.R. Rep. No. 101-485, pt. 2, at 61-62 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 343-44.

The House Judiciary Committee sought to clarify the "intent" element which a plaintiff must prove to prevail on an claim brought under the association provision. As that Committee explained:

14

This provision applies only when the employer knows of the association with the other person and knows of that other person's disability. The burden of proof is on the individual claiming discrimination to prove that the discrimination was motivated by that individual's relationship or association with a person with a disability.

For example, it would be discriminatory for an employer to discriminate against a qualified employee who did volunteer work for people with AIDS, if the employer knew of the employee's relationship or association with the people with AIDS, and if the employment action was motivated by that relationship or association.

Similarly, it would be illegal for an employer to discriminate against a qualified employee because that employee had a family member or a friend who had a disability, if the employer knew about the relationship or association, knew that the friend or family member has a disability, and acted on that basis. Thus, if an employee had a spouse with a disability, and the employer took an adverse action against the employee based on the spouse's disability, this would then constitute discrimination.

This section would not apply if the employer did not know of the relationship or association, or if the employer did not know of the disability of the other person. Thus, if an employer fired an employee, and did not know of a relationship or association of the employee with a person with a disability, the employee could not claim discrimination under this section.

H.R. Rep. No. 101-485, pt. 3, at 38-39 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 461-62.

In a floor debate held subsequent to the publication of these two reports, Congressman Bartlett, a sponsor of the bill, sought to answer what he characterized as some "frequent questions raised by business persons" about the ADA. See 136 Cong. Rec. H9072 (1990) (statement of Rep. Bartlett). One such question was the following: "If an able-bodied employee who is about to be terminated for cause, claims a

15

relationship with a disabled individual, can he or she claim discrimination by association and be protected by the ADA?" Id. Congressman Bartlett answered that "[g]iven the hypothetical posed, the terminating employee would have to prove that the employer knew of the association and was terminating the employee because of that association, and not because he or she was otherwise [un]qualified." Id.

The few appellate cases that have been decided under the association provision have involved situations squarely anticipated by the 101st Congress. In Tyndall v. National Educ. Ctrs., Inc., 31 F.3d 209 (4th Cir. 1994), for example, an employee was terminated because she missed work repeatedly and extensively primarily to care for her disabled son. The terminated employee sued, alleging association discrimination. Consistent with the legislative intent expressed in the House Education and Labor Committee Report, however, the court rejected the plaintiff's claim. See id. at 214. See also H.R. Rep. No. 101-485, pt. 2, at 61-62 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 344 ("If [a non-disabled employee] violates a neutral employer policy concerning attendance or tardiness, he or she may be dismissed even if the reason for the absence or tardiness is to care for the [disabled associate].").

In other cases, employees with disabled relatives who were terminated for poor job performance sued under the association provision, but presented no evidence linking their terminations in any way with the fact that they had disabled associates. See Rogers v. International Marine Terminals, Inc., 87 F.3d 755 (5th Cir. 1996); Ennis v. National

16

Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55 (4th Cir. 1995). In these cases, consistent with Congressman Bartlett's statements at floor debate, the employers have prevailed. See Rogers, 87 F.3d at 760-61; Ennis, 53 F.3d at 61-62. See also 136 Cong. Rec. H9072 (1990) (statement of Rep. Bartlett), discussed *supra*.

In the present case, Wasatch does not claim that Den Hartog's performance as a schoolteacher was in any way deficient, except inasmuch as his presence on the campus may have attracted Nathaniel to the campus. Thus, the primary question presented in the present case--whether the association provision of the ADA protects a qualified employee from adverse employment action based on his disabled associate's misconduct, where the associate's misconduct does not impair the employee's job performance--is different from those presented in Tyndall, Rogers, and Ennis.[5] This question also appears not to have been confronted by the authors of the above-quoted House Reports, nor to have been addressed during Congressional floor debate on the ADA.

## B. Reasonable Accommodation

Although no court has yet addressed the issue, it appears from the language and legislative history of the ADA, and also from the EEOC's "interpretive guidance" thereto,

[5] Tyndall, Rogers, and Ennis are the only three appellate cases decided under the association provision of Title I of the ADA, 42 U.S.C. § 12112(b)(4) (1994). See also Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 47 (2d Cir. 1997) (applying association provisions of Titles I and III of the ADA, which govern employment discrimination and public accommodations, respectively, to municipal zoning case arising under ADA Title II).

17

that the protection afforded to non-disabled employees who have an association with a disabled person differs in one significant respect from that afforded to disabled employees. This difference is the application of the ADA's "reasonable accommodation" requirements.

In the regulations interpreting the ADA, the term "reasonable accommodation" is defined as:

> (ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

> (iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o)(1) (1996). "Reasonable accommodation" may include, but is not limited to:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B) (1994); accord 29 C.F.R. § 1630.2(o)(2)(ii) (1996).

The ADA states that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual

18

. . . ." 42 U.S.C. § 12112(a).  In the context of this general prohibition, the word "discriminate" is a term of art which includes "not making reasonable accommodations."  See 42 U.S.C. § 12112(b)(5) (1994); 29 C.F.R. § 1630.9(a) (1996).  By the plain terms of § 12112(b)(5), however, the ADA does not require an employer to make any "reasonable accommodation" to the disabilities of relatives or associates of an employee who is not himself disabled.

Specifically, 42 U.S.C. § 12112(b)(5)(A) (1994) defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability *who is an applicant or employee*,. . . ." (emphasis added).  Further, 42 U.S.C. § 12112(b)(5)(B) (1994) defines "discriminate" to include "denying employment opportunities to *a job applicant or employee* who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments *of the employee or applicant*." (emphasis added).  Thus, the plain language of both these provisions--the only two provisions requiring "reasonable accommodation" in Title I of the ADA--suggests that only job applicants or employees, but not their relatives or associates, need be reasonably accommodated.

We are confident that the lack of any reference to the associates or relatives of the employee or applicant in Section 12112(b)(5)'s articulation of the ADA's "reasonable accommodation" requirement is not due to any inadvertent omission.  In its Report, the

19

House Education and Labor Committee clearly expressed its intention that under the association provision, "[t]he employer need not provide any accommodation to the nondisabled employee." H.R. Rep. No. 101-485, pt. 2, at 61-62 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 344. See Subpart A, *supra*.

Our conclusion in this regard has also been reached by the EEOC, which, pursuant to 42 U.S.C. § 12116 (1994), has issued regulations and Interpretive Guidance on the ADA. The Interpretive Guidance notes that where an associate or relative of the employee is disabled, but the employee himself is not disabled:

> an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities. Thus, for example, an employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for a spouse with a disability.

29 C.F.R. Pt. 1630.8 app. at 349 (1996) (citing legislative history materials).[6] Thus, Wasatch was not required under the ADA to provide Den Hartog with any "reasonable accommodation" of *Nathaniel*'s disability.

## C. Prima Facie Case

---

[6]The EEOC Interpretive Guidance provides three examples of forbidden association discrimination: (1) refusal to hire where the employer makes an unfounded assumption that the employee will miss work in order to care for a disabled relative; (2) discharging an employee who does volunteer work with AIDS victims, due to fear that the employee may contract the disease; and (3) denying health benefits to a disabled dependent of an employee but not to other dependents, even where the provision of benefits to the disabled dependent would result in increased health insurance costs for the employer. 29 C.F.R. Pt. 1630.8 app. at 349 (1996).

In order to determine whether Den Hartog has presented evidence sufficient to permit a jury to find that he was fired because of his son's disability, we must address how such a claim might be proven. In cases involving general discrimination claims brought under ADA § 102(a), 42 U.S.C. § 12112(a) (1994), this court has adopted the "burden shifting" scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See White v. York Int'l Corp., 45 F.3d 357, 360-61 (10th Cir. 1995). All parties to the present case agree that the McDonnell Douglas framework should similarly be applied to claims of "association discrimination" brought under ADA § 102(b)(4), 42 U.S.C. § 12112(b)(4) (1994). We agree.

Although they agree that McDonnell Douglas applies, the parties suggest different formulations of the elements constituting a *prima facie* case of "association discrimination" under the ADA. Taking into account the suggestions of both parties and the case law decided under the ADA's generic provisions, we hold that in order to establish a *prima facie* case of "association discrimination" under ADA § 102(b)(4), 42 U.S.C. § 12112(b)(4), a plaintiff must demonstrate the following:

(1) the plaintiff was "qualified" for the job at the time of the adverse employment action;

(2) the plaintiff was subjected to adverse employment action;

(3) the plaintiff was known by his employer at the time to have a relative or associate with a disability;

21

(4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

See Ennis, 53 F.3d at 58 (setting forth similar test, in the context of general disability discrimination claim brought under ADA § 102(a), 42 U.S.C. § 12112(a)). If the plaintiff in an ADA "association discrimination" case can establish these four elements, then the burden shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the adverse employment action. See McDonnell Douglas, 411 U.S. at 802. Once such a reason is proffered, the burden shifts back to the plaintiff to show that the employer's stated reason is pretextual. See id. at 804.

In the present case, as Den Hartog notes, the court did not articulate these (or any other) elements of a McDonnell Douglas *prima facie* case. Nonetheless, we do not agree with Den Hartog that the district court's failure to state these elements formally means that Den Hartog was denied the benefit of the McDonnell Douglas framework. Rather, it appears that the court simply presumed that Den Hartog *made* his *prima facie* case, and thus proceeded to consider whether the defendants' proffered non-discriminatory reason for terminating Den Hartog--concerns about the "direct threat" posed by Nathaniel's crimes and threats--was pretextual. See Den Hartog, 909 F. Supp. at 1402. The fact that the district court resolved this subsequent question in favor of the defendants does not render harmful to Den Hartog any error that the court may have committed in failing to set forth and apply the elements of the *prima facie* case.

22

III.    <u>DISABILITY-CAUSED MISCONDUCT UNDER THE ADA</u>

Both the district court and the appellees on appeal have attempted to draw a bright line between discrimination based on a disability (which they concede is generally prohibited by the ADA) and discrimination based on <u>misconduct</u> by the disabled person (which they agree is not prohibited by the ADA).  In evaluating that proffered dichotomy, we look to the general provisions of the ADA.  However, in looking to the general provisions of the ADA for guidance in this case where the misconduct comes not from the employee but rather from an associated person, we must keep in mind that 1) summary judgment in this case could not be predicated upon misconduct by Den Hartog[7] and 2) Wasatch had no duty to reasonably accommodate Nathaniel's disability.

The text of the ADA makes only one specific reference to "disability-caused misconduct," where an employer is authorized to disregard the fact that the misconduct or prior performance may be caused by a disability and where the employer can hold the disabled person to exactly the same conduct as a non-disabled person.  It provides that an employer:

> may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the alcoholism or drug use of such employee.

---

[7]  <u>See</u> Part IVA, *infra*.

23

42 U.S.C. § 12114(c)(4) (1994); see also 42 U.S.C. § 12114(a) (1994) (providing that the term "qualified individual with a disability" under the ADA shall not include illegal drug users when the covered entity acts on that basis).

Den Hartog claims that because Congress only expressly permitted employers to hold illegal drug users and alcoholics to the same objective standards of conduct as other employees even though their disability causes misconduct or poor performance, Congress implicitly did not intend to extend the same employer prerogative to employees with *other* disabilities. See Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."). He thus claims that the district court erred by importing the "disability v. disability-caused misconduct" dichotomy into a case in which neither drugs nor alcohol were involved. We agree.

As a general rule, an employer may *not* hold a disabled employee to precisely the same standards of conduct as a non-disabled employee unless such standards are job-related and consistent with business necessity.[8] See, e.g., EEOC Enforcement Guidance: Psychiatric Disabilities and the Americans With Disabilities Act, 2 EEOC Compl. Man. (BNA), filed after Section 902, at 28 ¶ 30 (Mar. 25, 1997) (stating by way of example that

---

[8]A disabled employee may be held to any performance criteria that are job-related and consistent with business necessity, so long as the disabled employee is given the opportunity to meet such performance criteria by reasonable accommodation. 42 U.S.C. § 12113(a).

an employer must make some reasonable exception to a general policy requiring employees to be neat and courteous in order to accommodate a mentally disabled employee whose disability led to a deterioration of neatness and courtesy where neatness and courtesy are not essential to that employee's job because it does not involve interaction with customers or co-workers).

Pursuant to 42 U.S.C. § 12114(c)(4), employers need not make any reasonable accommodations for employees who are illegal drug users and alcoholics. However, that is in marked contrast to all other disabilities, where the ADA does require that the employer extend reasonable accommodations. Thus, the disability v. disability-caused conduct dichotomy seems to be unique to alcoholism and drugs.[9]

Further, any such sharp dichotomy would make no sense when considering other provisions of the ADA. For example, an employer need not make any accommodation that would constitute an "undue hardship." 42 U.S.C. § 12112(b)(5)(A) (1994); see also 42 U.S.C. § 12111(10) (1994) (defining "undue hardship" and delineating factors to be considered in determining what constitutes an undue hardship). In addition, an employer

---

[9]Although 42 U.S.C. § 12114(a) (1994) exempts only alcoholism and illegal drug use from disability protection, the ADA also enumerates a number of psychological impairments which are not disabilities and thus cannot give rise to a claim under the ADA. These disorders include transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, other sexual behavior disorders, compulsive gambling, kleptomania, pyromania, and psychoactive substance use disorders resulting from current illegal use of drugs. 42 U.S.C. §§ 12208, 12211(b) (1994). Homosexuality and bisexuality are also identified as being neither impairments nor disabilities. 42 U.S.C. § 12211(a) (1994).

may take action against an employee who poses a "direct threat" to the health or safety of other individuals in the workplace. 42 U.S.C. § 12113(b) (1994). The availability of these affirmative defenses establishes that there are certain levels of disability-caused conduct that need not be tolerated or accommodated by employers. However, the necessary corollary is that there must be certain levels of disability-caused conduct that have to be tolerated or accommodated. Thus, appellees' effort to put all disability-caused conduct beyond the pale of ADA protection cannot be correct.

Mental illness is manifested by abnormal behavior, and is in fact normally diagnosed on the basis of abnormal behavior. See Diagnostic and Statistical Manual of Mental Disorders 350 (4th ed. 1994) (stating that bipolar disorder may be diagnosed "by the occurrence of one or more Manic Episodes or Mixed Episodes"). To permit employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior would largely nullify the ADA's protection of the mentally disabled.

The district court misinterpreted the holdings of our sister circuits when it stated that "the majority of Circuit Courts of Appeal interpreting [42 U.S.C. § 12112(a)--the basic ADA provision prohibiting discrimination because of disability] have concluded that the 'because of the disability' language requires some discrimination caused by the disability itself and not on misconduct which may be caused by the disability." Den Hartog, 909 F. Supp. at 1401 (citing cases). In fact, all three cases cited by the district

26

court in direct support of this proposition involved either illegal drug using or alcoholic employees, expressly unprotected under 42 U.S.C. § 12114(c)(4) (1994). See Collings v. Longview Fibre Co., 63 F.3d 828, 832 (9th Cir. 1995), cert. denied, 116 S. Ct. 711 (1996) (employees discharged for drug-related misconduct at the workplace); Despears v. Milwaukee County, 63 F.3d 635, 637 (7th Cir. 1995) (alcoholic plaintiff demoted because he lost his driver's license as a result of driving drunk); Maddox v. University of Tenn., 62 F.3d 843, 848 (6th Cir. 1995) (alcoholic plaintiff discharged following arrest for drunk driving). Unlike the three cases cited by the district court, the present case does not involve an application of 42 U.S.C. § 12114(c)(4). For this reason, these cases have only limited relevance to cases, including the present case, in which the plaintiff is *not* an illegal drug user or alcoholic.

One case cited in indirect support of the district court's proposition, Siefken v. Village of Arlington Heights, 65 F.3d 664 (7th Cir. 1995), did involve a (physically) disabled plaintiff who was neither an illegal drug user nor an alcoholic. In Siefken, a diabetic police officer was terminated after he "erratically drove his squad car at high speed through residential areas some forty miles outside his jurisdiction," while suffering a severe diabetic reaction. Id. at 665. The district court thus correctly characterized Siefken as a case involving a plaintiff terminated on account of "disability-caused misconduct," in which summary judgment in favor of the defendant was affirmed. The Siefken court, however, rested its holding primarily on the issue of causation. Rather

27

than holding that "disability-caused misconduct" is never protected under the ADA, the court simply found that the plaintiff's diabetes was *not* the proximate cause of his misconduct, but rather was only a "but-for" cause.  See id. at 666.  It found that the plaintiff's failure to monitor his condition--such failure being within his control and not caused by his disability--was the proximate cause.  Id.  However, it did not adopt the proposition that "disability-caused misconduct" would never receive protection under the ADA if the conduct was proximately caused by the disability.  Other cases and authorities cited by appellant are similarly inapposite.[10]

---

[10]For example, the district court cited a letter from an EEOC Communications Director to a U.S. Senator, which said that:

> an employer may hold all employees (i.e., those with and without disabilities) to the same conduct standards.  This would certainly include rules prohibiting violence or the threat of violence in the workplace. Although an employer may be required to provide reasonable accommodation (when requested in advance) so that an individual can meet conduct standards, an employer would not be required to rescind discipline for misconduct.  Therefore, it appears that this employer could terminate the employee for bringing a loaded gun onto company property, assuming it would impose such discipline on employee without disabilities.

Den Hartog, 909 F. Supp. at 1401 n.7 (quoting Letter of January 4, 1995 from EEOC Communications Director Claire Gonzales to U.S. Sen. John Breaux) (internal punctuation marks omitted).  However, far from providing support for an intrinsic dichotomy between disability and "disability-caused misconduct," this letter appears to explain the "direct threat" principle set forth at 42 U.S.C. §§ 12111(3), 12113(b) (1994). See Part IV, *infra*.  Under this principle, an employer may discipline an employee who poses a significant risk to the health or safety of others in the workplace.  The fact that an employer may discipline an employee whose "disability-caused misconduct" threatens the safety of others in the workplace, however, does not mean that the employer may discipline an employee whose "disability-caused misconduct" does not pose such a

(continued...)

We therefore disagree with the district court's conclusion that the ADA's general anti-discrimination provision, 42 U.S.C. § 12112(a), contemplates a stark dichotomy between "disability" and "disability-caused misconduct." Rather, the language of the ADA, its statutory structure, and the pertinent case law, suggest that an employer should normally consider whether a mentally disabled employee's purported misconduct could be remedied through a reasonable accommodation. If so, then the employer should attempt the accommodation. If not, the employer may discipline the disabled employee only if one of the affirmative defenses articulated in 42 U.S.C. §§ 12113, 12114 (1994) applies. Otherwise, the employer must tolerate eccentric or unusual conduct caused by the employee's mental disability, so long as the employee can satisfactorily perform the essential functions of his job. See, e.g. EEOC Enforcement Guidance: Psychiatric Disabilities and the Americans With Disabilities Act, 2 EEOC Compl. Man. (BNA), filed after Section 902, at 28 ¶ 30 (Mar. 25, 1997) (stating by way of example that an employer must make an exception to a general policy requiring employees to be neat and courteous in order to accommodate a mentally disabled employee whose job does not involve interaction with customers or co-workers).

We thus proceed to determine whether any such affirmative defenses apply to the present case.

---

[10](...continued)
"direct threat" (and does not otherwise violate reasonable job-related qualifications consistent with business necessity or fall within another ADA exception to protection).

29

IV.   "DIRECT THREAT" DEFENSE

A.   Factual Record of Direct Threat by Den Hartog and Nathaniel

The "direct threat" defense is codified at 42 U.S.C. §§ 12111(3), 12113(b) (1994). Under the ADA, the term "direct threat" means "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."[11]  42 U.S.C. § 12111(3) (1994).  Without running afoul of the ADA, an employer may define as a qualification for any job that "an individual shall not pose a direct threat to the health or safety of [the individual himself or] other individuals in the workplace."  42 U.S.C. § 12113(b) (1994); see also 29 C.F.R. § 1630.15(b)(2) (1996) (including "the individual" himself in the definition).

The C.F.R. provides several criteria for determining whether an individual poses a "direct threat."  These factors include:

(1) The duration of the risk;
(2) The nature and severity of the potential harm;
(3) The likelihood that the potential harm will occur; and
(4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r) (1996).  These factors are to be evaluated "based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job."  Id.  Further, they are to be evaluated "based on a

---

[11]  The EEOC has supplemented the statutory definition by adding the following words: "a significant risk *of substantial harm* to the health or safety of *the individual or* others that cannot be eliminated *or reduced* by reasonable accommodation."  29 C.F.R. § 1630.2(r) (1996) (emphasis added to language found in regulation but not in statute).

reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." Id.

Because the district court granted summary judgment on the ground that the ADA never protects an employee from being terminated on the basis of his or any of his relatives' or associates' "disability-caused misconduct," it never ruled on the defendants' affirmative defenses that both Den Hartog and Nathaniel were "direct threats" under 42 U.S.C. §§ 12111(3), 12113(b) (1994). Den Hartog, 909 F. Supp. at 1405 n.8. These defenses were fully briefed and argued, however, before both the district court and this court. Because of our disagreement with the district court's resolution of the "disability-caused misconduct" issue, we must now address the application of the "direct threat" defense. See Seibert v. Oklahoma ex rel. Univ. of Okla. Health Sci. Ctr., 867 F.2d 591, 597 (10th Cir. 1989) ("An appellate court may affirm the judgment of a district court on any grounds that find support in the record, provided the litigants have had a fair opportunity to develop the record.").

In the present case, Wasatch and Loftin have alleged that both Den Hartog and Nathaniel were "direct threats" under 42 U.S.C. §§ 12111(3), 12113(b) (1994). In particular, they have alleged that Nathaniel was a "direct threat" in the literal sense, while Den Hartog was a direct threat "insofar as he was unwilling to cooperate in keeping his son Nathaniel off campus and away from Mt. Pleasant."

31

Den Hartog disputes, as a factual matter, that he was a "direct threat" under the ADA. In addition, Den Hartog argues that the "direct threat" defense is only applicable to employees who constitute a direct threat and it does not, as a matter of law, apply to associates or relatives of an employee who may constitute a direct threat. Further, Den Hartog says there is no evidence of an individualized assessment based on valid medical analysis or objective evidence that Nathaniel posed a direct threat. We consider these arguments in turn.

First, Den Hartog argues that he himself was not a "direct threat" to Wasatch under 42 U.S.C. §§ 12111(3), 12113(b) (1994). In support of this assertion, Den Hartog notes that both Wasatch headmaster Loftin and Wasatch Trustee Park Loughlin testified that they did not consider Den Hartog to pose a direct threat to others at Wasatch. Wasatch and Loftin seek to minimize the significance of this testimony by asserting that Den Hartog was a "direct threat" to Wasatch under 42 U.S.C. §§ 12111(3), 12113(b) (1994) "insofar as he was unwilling to cooperate in keeping his son Nathaniel off campus and away from Mt. Pleasant," even though he posed no risk in his personal capacity to the safety of members of the Wasatch community.

Given the presence in the record of Loftin and Loughlin's testimony stating that Den Hartog did not pose a direct threat to Wasatch, Den Hartog has created at least a genuine issue of material fact as to whether he did pose such a threat. Indeed, the gravamen of the defendants' argument on this issue seems to accuse Den Hartog of being

32

an "indirect threat," rather than a "direct threat." Thus, the defendants are not entitled to summary judgment on the ground that Den Hartog posed a direct threat to Wasatch.

Alternatively, the defendants seek summary judgment on the ground that Nathaniel posed a "direct threat" to Wasatch or Loftin. Den Hartog responds, as a threshold matter, that the evidence in the record supporting the defendants' claim does not meet the evidentiary level established by 29 C.F.R. § 1630.2(r) (1996). Den Hartog predicates this response solely on Loftin's failure to obtain medical evidence prior to deciding that Nathaniel's presence on the Wasatch campus posed a risk to the safety of the members of the Wasatch community. Den Hartog's argument lacks merit.

As Den Hartog correctly asserts, the determination that an individual poses a "direct threat" should be based on an "individualized assessment" that relies on "the most current medical knowledge <u>and/or</u> on the best available objective evidence." 29 C.F.R. § 1630.2(r) (1996). (Emphasis added.) However, 29 C.F.R. § 1630.2(r) does not require an independent medical examination when the available objective evidence is clear. It uses the conjunctive "and/or" between medical knowledge and objective evidence. <u>See</u> 29 C.F.R. Pt. 1630.2(r) app. at 346 (1996) ("The assessment that there exists a high probability of substantial harm . . . must be strictly based on valid medical analyses and/or on other objective evidence."). Loftin's determination that Nathaniel posed a direct threat to the Wasatch community was based on the undisputed objective facts that Nathaniel repeatedly issued direct threats to members of the Wasatch community--including

33

Loftin's own four-year-old daughter--and demonstrated his propensity to carry them out, including breaking the ribs of one of his former schoolmates and engaging in other violent behavior. The threat Nathaniel posed to the security of the Wasatch community objectively appeared to Wasatch and Loftin to be grave in nature, likely to result in harm severe in magnitude, and both imminent and ongoing in duration, thereby satisfying all the factors under 29 C.F.R. § 1630.2(r) (1996). Wasatch and Loftin came to these eminently reasonable conclusions based on their "individualized assessment" of Nathaniel, rather than upon any predetermined or unfounded general stereotypes about people with bipolar affective disorder. See H. R. Rep. No. 101-485, pt. 3, at 45 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 468 ("The purpose of creating the 'direct threat' standard is to eliminate exclusions which are not based on objective evidence about the individual involved. Thus, in the case of a person with mental illness there must be objective evidence from the person's behavior that the person has a recent history of committing overt acts or making threats which caused harm or which directly threatened harm."); see also 29 C.F.R. Pt. 1630.2(r) app. at 346 (1996).

We hold on this record that there is no genuine issue of material fact as to whether Nathaniel posed a significant risk to the safety of members of the Wasatch community.

B. Does the "Direct Threat" Defense Apply to Associates or Relatives?

The legal issue remaining is whether the ADA permits an employer to discipline or discharge a non-disabled employee whose disabled relative or associate, because of his or

her disability, poses a direct threat to the employer's workplace. This issue appears to be one of first impression.

As Den Hartog notes, the language of the ADA might be read to suggest that the "direct threat" affirmative defense applies only where the *employee* poses the direct threat to the workplace, because the defense arises in the context of elaborating upon the permissible "qualification standards" for a job. See 42 U.S.C. § 12113(b) (1994). Job qualifications are expressed in 42 U.S.C. § 12113(a), which clearly refers to employees or job applicants. Job qualifications obviously do not apply directly to associates or relatives of an employee because they are not the ones being employed. However, although the pertinent EEOC regulations and interpretive guidance discuss the "direct threat" defense in terms of a threat to individuals in the workplace, they do not require that the threat come only from the employee, as opposed to the associate or relative of the employee. See 29 C.F.R. §§ 1630.2(r), 1630.15(b)(2) (1996); 29 C.F.R. Pt. 1630 app. at 346-47 (1996).

Although the language of 42 U.S.C. §§ 12111(3), 12113(b) does not expressly cover the present situation, it would be odd that the ADA would permit an employer to take steps to protect its workplace from "direct threats" posed by mentally disabled *employees*, 42 U.S.C. §§ 12111(3), 12113(b), and also from "direct threats" posed by mentally disabled *customers*, 42 U.S.C. § 12182(b)(3), but not allow the employer to protect its workplace from "direct threats" posed by mentally disabled *associates or*

35

*relatives* of non-disabled employees.  Because of the apparent oddness of a statutory

scheme which would provide an employer with no recourse against "direct threats" posed

by this one small group of individuals, but does provide recourse in all other "direct

threat" situations, we feel compelled to search for evidence that Congress intended such a

result before holding that result to obtain.  See Public Citizen v. United States Dept. of

Justice, 491 U.S. 440, 454 (1989) ("Where the literal reading of a statutory term would

'compel an odd result,' we must search for other evidence of congressional intent to lend

the term its proper scope.") (internal citation omitted).

In its Committee Report on the ADA, the House Judiciary Committee expressed its

intention that the "direct threat" standard should codify the standard applied under the

Rehabilitation Act by the Supreme Court in School Bd. of Nassau County v. Arline, 480

U.S. 273, 287-88 (1987).  H.R. Rep. No. 101-485, pt. 3, at 34, 45 (1990), reprinted in

1990 U.S.C.C.A.N. 445, 457, 468.  In Arline, the Court remanded for further findings of

the contagiousness of a schoolteacher who had contracted tuberculosis to determine

whether she posed a significant risk of communicating her disease to others in the

workplace and whether reasonable accommodation could eliminate that risk.  Arline, 480

U.S. at 288-89.  Although the schoolteacher there was an employee, the thrust of the case

was not whether the threat came from an employee or a relative or associate of an

employee, but rather whether the employer was acting upon actual objective evidence of a

threat, or upon stereotypical assumptions of the threat.  See H.R. Rep. No. 101-485, pt. 3, at 45 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 468.

> [A]n employer may not assume that a person with a mental disability . . . poses a direct threat to others.  This would be an assumption based on fear and stereotype.  The purpose of creating the "direct threat" standard is to eliminate exclusions which are not based on objective evidence about the individual involved.  Thus, in the case of a person with mental illness there must be objective evidence from the person's behavior that the person has a recent history of committing overt acts or making threats which caused harm or which directly threatened harm.

Id. at 45-46, 1990 U.S.C.C.A.N. at 468-69.

Elsewhere in the Report, the Committee also expressed its intention that the "direct threat" defense should extend to permit an entity to deny a disabled  individual from participating in or benefiting from the goods, services, facilities, privileges, advantages and accommodations of the entity, where the disabled individual poses a direct threat to the health or safety of others.  See id. at 62, 1990 U.S.C.C.A.N. at 485.  The Committee intended that "[t]his provision [be] identical to one added in the employment section," and advised that "the discussion of this issue there applies here as well."  Id.  See also 42 U.S.C. § 12182(b)(3) (1994) (codifying this application of the "direct threat" defense).

The legislative history of the association provision, discussed Part IIA, *supra*, does not discuss any affirmative defenses to claims brought under that provision.  In our view, this lack of discussion is most likely due to the Committee's presumption that the affirmative defenses available to employers defending association discrimination claims-- including the "direct threat" defense--would be identical to those available in other ADA

37

contexts. This presumption would logically follow from the association provision's location in the ADA, as part of the statutory definition of "discriminate," which appears in the basic anti-discrimination provisions of 42 U.S.C. § 12112(a). See 42 U.S.C. § 12112(b)(4).

Our conclusion in this regard is bolstered by the fact that the association provision does not require any "reasonable accommodation," see Part IIB, *supra*, and therefore provides *less* protection against discrimination to employees than does the ADA's basic provision, 42 U.S.C. § 12112(a). We see nothing in the legislative history indicating that Congress intended to provide *less* protection to non-disabled employees with disabled relatives or associates than to disabled employees and job applicants with respect to ADA's central "reasonable accommodation" requirement, yet simultaneously to provide, *sub silentio*, *more* protection to non-disabled employees whose disabled relatives or associates posed direct threats to the employees' workplace than to disabled employees and job applicants who posed identical direct threats to the same workplace. We think it far more likely that Congress assumed that 42 U.S.C. § 12113(b)'s "direct threat" defense would apply to cases where the direct threat came from relatives or associates of the employee as well as to those cases where the direct threat came from the employee himself or herself. Cf. Moragne v. States Marine Lines, Inc., 398 U.S. 375, 392 (1970) ("By the terms of a statute, [the legislature] also indicates its conception of the sphere within which the policy is to have effect.").

38

As with the maritime statutes at issue in <u>Moragne</u>, we think that the language of the association provision of the ADA reflects the dimensions of the particular problem that came to the attention of the legislature and that provision invites "the conclusion that the legislative policy is equally applicable to other situations in which the mischief is identical." <u>Id.</u> at 392.[12] Because the legislative policy underlying the availability of the "direct threat" defense under the primary provisions of the ADA is equally applicable to the association provision, we hold that the ADA permits an employer to discipline or discharge a non-disabled employee whose disabled relative or associate, because of his or her disability, poses a direct threat to the employer's workplace.

Accordingly, the district court's grant of summary judgment in favor of the defendants with respect to Den Hartog's ADA claim is affirmed. Because we hold that the defendant's motive for terminating Den Hartog was lawful, we need not reach Den Hartog's claim pertaining to the defendants' alleged "mixed motives." Similarly, because we affirm the district court's grant of summary judgment in favor of Wasatch and Loftin for the reasons discussed above, we need not consider Wasatch and Loftin's claim that

---

[12]At least one other circuit court has already filled in a "missing" provision of the ADA, based on Congress's clearly expressed legislative intent. In <u>Innovative Health Sys., Inc. v. City of White Plains</u>, 117 F.3d 37, 47 (2d Cir. 1997), the Second Circuit applied the association provisions of Titles I (employment) and III (public accommodations and services operated by private entities) of the ADA, 42 U.S.C. §§ 12113(b), 12182(b)(3), to a case arising under Title II (public services), which contains no similar provision.

Den Hartog's "wrongful transfer" claim is time-barred under ADA's statute of limitations.

## V.    MOTION IN LIMINE

In a motion in limine, Den Hartog challenged the admission of a variety of evidence pertaining to Nathaniel's potential to engage in violent or antisocial conduct. The district court treated Den Hartog's motion as though it were two separate motions: one motion to exclude evidence with respect to the ADA claim, and another motion to exclude the same evidence with respect to the contract claim. It denied the "first" of these two motions as moot, and denied the "second" motion on its merits. Den Hartog appeals the denial of the motion(s) in limine.

We review a ruling on a motion in limine as deferentially as we review a ruling on evidence. See United States v. Flanagan, 34 F.3d 949, 952 (10th Cir. 1994) ("We review the district court's denial of a motion in limine for an abuse of discretion.").

In the present case, the district court correctly noted that most of the challenged documents were admissible under various hearsay exceptions and exemptions articulated in the Federal Rules of Evidence. See Den Hartog, 909 F. Supp. at 1396 n.1. Den Hartog does not articulate any specific challenge to this conclusion. Nor does Den Hartog find any specific faults with the district court's analysis of his motion in limine with respect to his contract claim. We see no basis for concluding that the district court

abused its discretion by denying Den Hartog's motion in limine with respect to the contract claim.

Den Hartog also alleges that the district court should not have denied his motion in limine with respect to the ADA claim "as moot." In light of our conclusions set forth in the previous Parts of this opinion, we agree with the district court that Den Hartog's motion in limine was moot with respect to the ADA claim, and in any event, Den Hartog has not made a persuasive showing that such documents should have been disallowed in limine even if the ADA claim had proceeded to trial.

## CONCLUSION

The district court's grant of summary judgment in favor of the defendants on Den Hartog's ADA claim is AFFIRMED. The district court's denial of Den Hartog's motion in limine is also AFFIRMED.